OPINION
{¶ 1} Defendant-appellant, Perry R. Silverman, appeals from the judgments of the Franklin County Court of Common Pleas, whereby the trial court convicted appellant of ten counts of theft, two counts of tampering with evidence, one count of tampering with records, one count of falsification, one count of forgery, and one count of engaging in a pattern of corrupt activity.
 {¶ 2} Plaintiff-appellee, the State of Ohio, indicted appellant on: (1) one count of tampering with records, a third-degree felony, in violation of R.C. 2913.42; (2) two counts of tampering with evidence, third-degree felonies, in violation of R.C. 2921.12; (3) one count of falsification, a third-degree felony, in violation of R.C. 2921.13; and (4) one count of forgery, a fourth-degree felony, in violation of R.C. 2913.31. Appellee also indicted appellant on 12 counts of theft, in violation of R.C. 2913.02. Specifically, appellee alleged that appellant committed: (1) third-degree felony theft by stealing $100,000 or more against the estate of Queen Alazar; (2) second-degree felony theft by stealing $25,000 or more from Michael Myers, a disabled adult; (3) fourth-degree felony theft by stealing more than $5,000, but less than $100,000, from Capital Plus, Inc.; (4) second-degree felony theft by stealing $25,000 or more from Mark Pollard, a disabled adult; (5) second-degree felony theft by stealing $25,000 or more from Faith Barnes, a disabled adult; (6) second-degree felony theft by stealing $25,000 or more from William Chitwood, a disabled adult; (7) fourth-degree felony theft by stealing more than $5,000, but less than $100,000, from Gosh Enterprises, Inc.; (8) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Janice Powell; (9) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Sara and Daniel Miller; (10) third-degree felony theft by stealing $5,000 or more, but less than $25,000, from John Jones, a disabled adult; (11) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Paula and David Cremer; and (12) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Gary Legg. Lastly, in relation to the above-noted crimes, appellee indicted appellant on one count of engaging in a pattern of corrupt activity, a second-degree felony, in violation of R.C. 2923.32, alleging that, "on or about November 10, 2000 through July 31, 2004, * * * while employed by, or associated with an enterprise, to wit: Perry R. Silverman Co., L.P.A. did conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity" through the alleged theft and forgery offenses. Appellant was indicted on the above charges in three separate cases.
 {¶ 3} Appellant pled not guilty to the charges. Before the case proceeded to trial, appellee moved to consolidate the cases into one trial. The trial court granted the motion, noting that appellant's trial counsel did not oppose the motion.
 {¶ 4} Appellant also elected to try the case before the trial court and waived his right to jury trial. Appellant signed a document indicating that he "voluntarily waive[d] and relinquish[ed] [his] right to a trial by jury and elect[ed] to be tried by a judge[.]" Appellant also verbally acknowledged to the trial court that he signed the jury trial waiver form, and appellant indicated to the trial court that he was "satisfied that [he] prefer[ed] to try the case [to the trial court] rather than the jury[.]" (June 10, 2005 Tr. at 3.)
 {¶ 5} During opening statements at trial, appellant's trial counsel noted that appellant started the law firm of Perry R. Silverman Co., L.P.A., in 1984, and that appellant practiced personal injury law and established a credit collections practice. Appellant's trial counsel asserted that appellee's case "is based on documents that they cannot attribute to him, built on testimony of dishonest employees who had a motive and an opportunity to lie and predicated on supposition and innuendo." (Vol. I Tr. at 22.) In arguing as such, counsel claimed that appellant relied heavily on his employee, Bruce Gurwin, when appellant experienced depression, family issues, and an intense workload. Counsel argued that Gurwin had the opportunity to commit the alleged crimes, and Gurwin had the motive to commit the alleged crimes in order to sustain his salary and the salary of Heather Rodgers, a co-employee.
 {¶ 6} Appellee called Michael Myers to testify at trial, and Myers testified to the following. Myers sustained serious injuries from an automobile accident, and his doctor told him that he would not be able to return to work. Appellant handled Myers' personal injury case, and, as an attorney fee, appellant would receive one-third of any money recovered. Ultimately, the case settled for $250,000. In July 2001, appellant showed Myers the settlement check, but told him that there were "a lot of things involved with releasing" the check to Myers. (Vol. I Tr. at 37.) In the course of events, appellant would tell Myers "a lot of different things" as to why Myers was not receiving his money, such as the insurance company wanting the money back. (Vol. I Tr. at 36.) Eventually, appellant gave Myers approximately $20,000 through separate distributions. Appellant once gave Myers a check with insufficient funds. When Myers called appellant about the problem, appellant met Myers at the bank. Appellant brought another check and told Myers not to cash it at the bank, but to cash the check at a check cashing service. The check cashing service initially would not cash the check due to insufficient funds, but, ultimately, an employee of the service cashed the check after taking an $800 fee.
 {¶ 7} On cross-examination, appellant's trial counsel had Myers confirm that the Ohio Bureau of Workers' Compensation paid Myers' medical expenses. Appellant's counsel asked if the bureau had a lien on the settlement money, and Myers stated that no one indicated to him that such a lien existed.
 {¶ 8} Next, Michael Mosley testified at trial on appellee's behalf. Mosley testified to the following. Mosley's wife, Queen Alazar, died after being in a car accident involving law enforcement chasing a drunk driver. Mosley and Alazar had one child, Fatima Mosley, who was 13 years old when Alazar died. Appellant represented Mosley, the fiduciary of Alazar's estate. In August 2003, Mosley received a summons to attend a Franklin County Probate Court hearing. Appellant advised Mosley not to attend. However, the probate court scheduled another hearing that Mosley did attend. At the hearing, Judge Belskis asked about money owed to the Alazar estate, and Mosley indicated at the hearing that he had no knowledge of certain monies owed to the estate.
 {¶ 9} Appellee then had Mosley identify a $100,000 settlement check that State Farm Insurance Company ("State Farm"), issued the Alazar estate in January 2002. Mosley testified that he had not seen the check before trial. After appellee concluded its direct examination of Mosley, appellant's counsel asked no questions on cross-examination.
 {¶ 10} Faith Barnes testified as follows on appellee's behalf. Barnes was involved in a disabling automobile accident in June 2001. Barnes hired appellant to handle her personal injury case, and, as an attorney fee, appellant would receive one-third of any money recovered. Appellant obtained a $12,500 settlement from Barnes' insurance company. Barnes went to appellant's office to obtain her money, but appellant would only give her $3,000, claiming that he had to make deductions for costs in pursuing the case. Appellant also gave Barnes a $2,000 advance against the proceeds of a pending settlement with the person at fault in the accident. That second settlement ultimately amounted to $60,000. Appellant went to Barnes' home with a check for $15,000 and a check for $45,000. Barnes signed the checks, but appellant did not give Barnes any of the money. Appellant indicated that he needed to settle Barnes' related Medicaid lien. Barnes later spoke with appellant numerous times about receiving money owed to her, but appellant kept indicating that he was still settling with Medicaid. Ultimately, appellant gave Barnes no additional money. On cross-examination, appellant's counsel had Barnes confirm that appellant showed her the itemized deductions concerning the first $12,500 settlement.
 {¶ 11} Mark Pollard testified as follows on appellee's behalf. Pollard was injured in an automobile accident in June 2002. Pollard sustained serious injuries from the accident and had not been back to work since the accident. Pollard hired appellant to handle his personal injury case. As a fee, appellant would receive one-third of any money recovered. Eventually, Pollard's case settled for $100,000. Appellant indicated that the money would need to stay in his law firm trust account due to a Medicaid lien. Appellant told Pollard that he was negotiating with Medicaid. Ultimately, appellant gave Pollard $7,000 in separate distributions between September 2002 and November 2003. On cross-examination, appellant's trial counsel showed Pollard an August 2004 letter from the Ohio Tort Recovery Unit ("OTRU") mentioning a Medicaid-related lien for approximately $45,000. Pollard indicated that he had never seen the letter prior to trial.
 {¶ 12} William Chitwood testified as follows on appellee's behalf. Chitwood was involved in an accident in December 2002. Chitwood sustained serious injuries, lost his job, and was declared disabled. Chitwood hired appellant to handle his personal injury case and agreed to pay appellant, as a fee, one-third of any money recovered. Appellant obtained a $100,000 settlement, and, at appellant's instruction, Chitwood gave appellant his medical bills. Subsequently, appellant never gave Chitwood any verification that he was paying the medical bills. In the course of events, Chitwood discovered that his insurance company settled for approximately $4,000. Appellant never informed Chitwood about the settlement. Chitwood received no money from either settlement and no money was paid to Chitwood's healthcare providers or insurers. Chitwood, having lost his job, would call appellant "panic-stricken" because he had bills to pay and because he knew he would lose his house to a foreclosure due to his inability to pay his mortgage. (Vol. I Tr. at 122.) Eventually, Chitwood initiated bankruptcy proceedings. Appellant's trial counsel asked no questions on cross-examination.
 {¶ 13} John Romelfanger testified as follows on appellee's behalf. Romelfanger is the chief operating officer for Commerce National Bank. At one time, Perry R. Silverman Co., L.P.A., had accounts with Commerce National Bank. The bank eventually terminated the banking relationship due to frequent overdrafts on some of the accounts.
 {¶ 14} Romelfanger authenticated records from Commerce National Bank, and Romelfanger identified one record as a copy of check number 1577 for $5,000 to Perry R. Silverman Co., L.P.A., drawn on Perry R. Silverman Co., L.P.A.'s general trust account. Romelfanger then reviewed a copy of a check that appellant attached to a distribution report to the probate court in regards to the Alazar estate. The check was made out to Fatima Mosley for $223,196. The check was numbered 1577 and was drawn on the law firm general trust account. Romelfanger testified that the check in the distribution report was altered from the original check numbered 1577 such that the payee and amount had been changed.
 {¶ 15} Romelfanger also identified a copy of check number 1585 to Perry R. Silverman Co., L.P.A., for $40,000, which was drawn on the law firm general trust account. Romelfanger then reviewed a copy of another check that appellant attached to the Alazar estate distribution report. The check was written to Perry R. Silverman Co., L.P.A., for $133,352. The check was numbered 1585 and was drawn on appellant's law firm general trust account. Romelfanger again indicated that the check was altered. In so concluding, Romelfanger noted that the copy in the distribution report contained the bank record's coding line that indicates that the check actually cleared for $40,000.
 {¶ 16} On cross-examination, Romelfanger confirmed that appellant's law firm used a courier service to pick up checks. Romelfanger was not certain whether Commerce National Bank would be liable for paying on checks made with an unauthorized signature.
 {¶ 17} Garwin Velie testified to the following on appellee's behalf. Velie is general counsel with Gosh Enterprises, Inc. In the fall of 2003, Gosh Enterprises, Inc., hired appellant to collect money from a debtor. Appellant would receive 25 percent of any money recovered. Appellant settled the claim for $40,000. Velie called appellant repeatedly about obtaining the money, but appellant would relate different reasons for why he had not relinquished the money. As an example, appellant once blamed the delay on an error with the firm's accounting software. Eventually, appellant went to Velie's office to give Velie a check for $30,000 in February 2004. The check was dated December 1, 2003, and the check did not clear due to insufficient funds. Appellant never paid the money to Gosh Enterprises, Inc. On cross-examination, appellant's counsel asked Velie if he ever spoke with appellant about the check not clearing. Velie stated that he never spoke with appellant, but that he attempted to reach appellant a number of times.
 {¶ 18} Robert Setzer testified to the following on appellee's behalf. Setzer is president and owner of Capital Plus, Inc. Capital Plus purchased accounts receivables and then collected the debts for itself. Capital Plus hired appellant to help with the company's collections. One case involved Staff Medical Services defrauding Capital Plus out of about $500,000. Appellant filed a lawsuit against Staff Medical Services and its owner, James Teague. Appellant obtained a judgment against the owner and even foreclosed on the owner's home. The foreclosure netted approximately $85,600. Because another party was claiming entitlement to the foreclosure funds, the trial court ordered appellant to escrow the funds pending the outcome of the dispute. Capital Plus eventually won the dispute, but appellant told Setzer that he could not release the funds until the other party's appeal time expired. The other company did not appeal, but appellant indicated that he could not release the funds until the trial court vacated the escrow order. The trial court vacated the order in November 2002, and appellant then asked Setzer if he could deduct the legal fees from the foreclosure funds. Setzer wanted appellant to remit immediately the $85,600. Appellant then told Setzer that he was going to keep the money due to a billing dispute, and appellant invited Setzer to file an arbitration claim with the bar association. Setzer relented, but received no money. Eventually, Setzer filed a lawsuit against appellant to recover the money. The day before a court-ordered deposition, appellant delivered Setzer a check for $59,800. However, the check did not clear due to insufficient funds, and Capital Plus never received its money. Appellant's counsel asked no questions to Setzer on cross-examination.
 {¶ 19} Janice Powell testified to the following on appellee's behalf. Powell sustained injuries from an accident at a department store. Powell hired appellant to handle her personal injury case; appellant would receive one-third of any money recovered. Appellant settled the case for $45,000. Appellant showed Powell a $45,000 check for Powell's signature. After Powell signed the check, appellant indicated that they needed to wait for a response from Powell's insurance company on subrogation issues regarding Powell's medical bills. Powell eventually received $20,000 in separate payments.
 {¶ 20} On cross-examination, Powell verified that, after the settlement, she became aware that she was obligated to reimburse her insurance company for medical bills. However, Powell indicated that she never saw a letter addressed to appellant indicating that Powell owed $9,803.08 in medical expenses to the insurance company.
 {¶ 21} Sara Miller testified to the following on appellee's behalf. Miller and her husband, Daniel, were involved in an automobile accident on November 16, 2002. The Millers hired appellant to handle their case. The Millers agreed that appellant would receive one-third of any recovery, which Sara Miller understood was applicable to funds recovered over and above reimbursement for medical bills totaling around $70,000. Appellant settled the Millers' case for $100,000. The Millers signed the check, and appellant took the check back. Appellant stated that he would try to obtain an agreement for lower medical bills, and appellant stated that he would use the settlement money to pay the medical bills. However, appellant paid none of the medical bills, and appellant gave the Millers no money from the settlement. On cross-examination, Miller indicated that it was possible that appellant could have been waiting for copies of Daniel Miller's medical bills.
 {¶ 22} Franklin County Probate Court Magistrate William Reddington testified to the following on appellee's behalf. In November 2000, Probate Court Judge Belskis approved a wrongful death settlement concerning Queen Alazar's estate. Judge Belskis ordered that an annuity be set up for Fatima Mosley. According to Reddington, the annuity was funded. Judge Belskis also ordered a trust fund for Fatima Mosley, and ordered that a report denoting distribution of the settlement proceeds be filed by December 15, 2000.
 {¶ 23} Around July 2003, Reddington discovered the absence of a distribution report, and the magistrate scheduled an August 14, 2003 hearing on the matter. Appellant was the attorney for the Alazar estate, and he filed a distribution report on August 13, 2003. The report indicated gross proceeds on the estate for $800,000. The report denoted total attorney fees of $266,704 to appellant and co-counsel John Waddy. The report also denoted payments to beneficiaries, including to Fatima Mosley. As noted above, appellant attached to the report a copy of check number 1585, which had been altered to indicate that the check was to Perry R. Silverman Co., L.P.A., for $133,352. Appellant also attached to the report a copy of check number 1577, which had been altered to indicate that the check was to Fatima Mosley for $233,196. Reddington was concerned about the distribution report because money should have gone to the wrongful death trust and not directly to Fatima Mosley, as the altered check purported. The magistrate also knew that no wrongful death trust had been established.
 {¶ 24} Appellant did not appear for the August 14, 2003 hearing, and Judge Belskis scheduled a contempt hearing for August 28, 2003. On August 27, 2003, appellant tried to open the wrongful death trust, but Reddington told appellant he could not open the trust because the court's cashier was closed, and Reddington could not accept the filing fee.
 {¶ 25} Reddington attended the August 28, 2003 contempt hearing. Franklin County Assistant Prosecutor David Buchman, who was prosecuting appellant's criminal case at trial, also attended the hearing because Reddington had spoken with him. At the hearing, according to Reddington, Judge Belskis asked about the settlement proceeds, including what happened to the check purportedly issued to Fatima Mosley. Reddington further stated that:
* * * [Appellant] indicated that he did not know exactly where the funds for Fatima Mosley had been deposited, he stated he had turned the matter over to a paralegal to get the trust established and to deposit the funds. And I believe the paralegal was named Karen Stone. And that this paralegal was no longer in [appellant's] employment.
The Court found [appellant] to be in contempt both for failure to appear at the [August 14, 2003] hearing * * * as well as advising [Michael Mosley] to not appear at the hearing, and fined him I believe $200, [$100] for each count. [The Court] also found Mr. Mosley to be in contempt for failure to appear but did not fine him. [The Court] further ordered [appellant] to provide * * * the Social Security number and last known address of [Karen Stone] * * *.
(Vol. II Tr. at 255-256.)
 {¶ 26} Likewise, at the hearing, there were "some questions from Judge Belskis as to why the check was made payable to Fatima Mosley individually, and why the back of the check was stamped — had typed on it for deposit only." (Vol. II Tr. at 257-258.) Judge Belskis also removed Michael Mosley from his fiduciary position on the Alazar estate.
 {¶ 27} At trial, Reddington identified an exhibit as a December 23, 2002 status letter from appellant to the probate court indicating that appellant was pursuing an action against Alazar's automobile insurer, State Farm. Appellant made no mention of the $100,000 check that State Farm had issued almost a year earlier.
 {¶ 28} Reddington also identified Exhibit T as a transcript of the August 28, 2003 contempt hearing. The magistrate reviewed the transcript and listened to the digital recording of the hearing. In doing so, the magistrate verified that Exhibit T fairly and accurately depicted what transpired at the hearing. The magistrate also testified that no "substantial variances" existed between the digital recording and the transcript. (Vol. II Tr. at 255.) However, the court reporter that made the transcript failed to sign the page that would have certified that the document was the court reporter's "stenographic transcription of the * * * probate court digital record of hearing[.]" (State's Exh. T at 95.) The transcript noted inaudible portions of the digital recording, but transcribed significant discourse between individuals participating at the hearing.
 {¶ 29} As denoted in Exhibit T, Judge Belskis discussed appellant's distribution report and asked appellant what happened to the check purportedly issued to Fatima Mosley. Judge Belskis also indicated at the contempt hearing that appellant disregarded court orders by purportedly writing a check directly to Fatima Mosley. At the hearing, Judge Belskis also asked appellant at what bank he established the court-ordered trust. Appellant indicated at the hearing that he did not personally give the money to Fatima Mosley, but that he gave the check to his paralegal, Karen Stone, and that he could not now account for the whereabouts of the money. Appellant also stated at the hearing that Karen Stone no longer worked for appellant, and that she had left the state of Ohio.
 {¶ 30} Mosley noted at the contempt hearing, as he did at trial, that he had not known of any problems with the Alazar estate. Moreover, Mosley indicated at the hearing, as he did at trial, that appellant told him not to appear at the August 14, 2003 citation hearing. Mosley also stated at the hearing that some court documents had referred to Fatima Mosley as Fatima Alazar.
 {¶ 31} At the contempt hearing, Buchman essentially told Judge Belskis that appellee could obtain bank information about money missing from the Alazar estate. Buchman also asked appellant about efforts he made to locate the missing money. Appellant answered that he had looked through his files.
 {¶ 32} Judge Belskis further discussed at the contempt hearing: (1) appellant's and Mosley's failure to appear at the August 14, 2003 citation hearing; (2) appellant's failure to timely file a distribution report; (3) appellant's irregularities in the tardy August 13, 2003 distribution report; (4) appellant's improper handling of the Alazar estate; (5) appellant's handling of the annuity for Fatima Mosley; and (6) the need for appellant to provide information about Karen Stone. Judge Belskis also stated that appellant breached his duties as an attorney for the Alazar estate.
 {¶ 33} At the conclusion of Reddington's direct examination and discussion of Exhibit T, appellant decided to proceed with the case by representing himself without the assistance of trial counsel. Appellant stated that he and trial counsel differed on ways to defend the case. The trial court granted appellant's request.
 {¶ 34} Heather Rodgers testified to the following on appellee's behalf. Rodgers worked for appellant in November 1998. Bruce Gurwin was the director of collections, and he took care of the collections clients. Stone worked for appellant four or five years before Rodgers started working with appellant. Stone did not handle anything on the Alazar case.
 {¶ 35} According to Rodgers, appellant primarily took care of the firm's banking, and appellant reconciled the bank accounts. Appellant would write checks for clients, but Rodgers once, with appellant's approval, wrote a check to a client when appellant was out of the office. Appellant would go to the bank on a daily basis, except when the firm was using a bank with a courier service. Appellant "automatically" took money mailed to the firm. (Vol. II Tr. at 307.) As far as the collections practice, Gurwin would prepare the deposits and appellant took the deposits to the bank. Rodgers rarely handled deposits stemming from the firm's collections practice.
 {¶ 36} During some instances, appellant intercepted outgoing mail containing checks to clients. Once, appellant had the mail courier open the mailbox so that he could retrieve some mail.
 {¶ 37} Sometime between 2002 and 2003, the firm's personal injury and collections clients would call to complain about not receiving money owed to them or about receiving checks that would not clear due to insufficient funds. The firm's employees also received paychecks that would not clear due to insufficient funds. Rodgers asked appellant if the firm was experiencing money problems, and appellant stated that he was getting a loan and that everything was fine.
 {¶ 38} In March 2004, appellant moved his law practice to Rick Brunner's law offices. Appellant was undergoing disciplinary proceedings for ethics violations, and attorney Brunner was overseeing appellant's cases. Rodgers understood that the collections practice would continue. Eventually, Brunner terminated Rodgers' and Gurwin's employment. Appellant was present during the termination, but did not say anything.
 {¶ 39} On cross-examination, Rodgers testified that she had previously asked Gurwin for pay raises and that Gurwin would inform her when she would receive bonuses and pay raises. Rodgers also verified that appellant would have to hold client settlement money to negotiate subrogation issues. Furthermore, Rodgers testified that Gurwin kept blank checks in his office and that Gurwin printed checks in his office.
 {¶ 40} On re-direct examination, Rodgers stated that she could recognize appellant's signature, and identified appellant's signature as a drawer on checks from the firm's general trust account that involved the Alazar estate. Rodgers also stated that it would surprise her to know that appellant did not "know what was going on with the money of the * * * checking accounts with the firm[.]" (Vol. II Tr. at 379.)
 {¶ 41} Next, Gurwin testified on appellee's behalf as follows. Gurwin worked for appellant as collections director by managing and running the firm's collections practice. Gurwin had been working with appellant for approximately ten years. Gurwin would post payments in the collections system, prepare deposits, and prepare client billing statements. Gurwin had signature authority on the firm's payroll, court costs, and operating accounts. Gurwin often wrote checks from the court cost account and "maybe once or twice" from the operating account. (Vol. II Tr. at 399.) On rare occasions, Gurwin would make deposits. Appellant chose the firm's banking locations. The firm had used a series of different banks, and appellant closed the accounts at a particular bank and set up accounts at a new bank. Appellant reconciled all of the firm's accounts except that Gurwin reconciled the court cost account.
 {¶ 42} Gurwin spoke with some of the firm's collections clients who received checks that would not clear due to insufficient funds. Gurwin spoke with appellant about the situation, and appellant stated that he would look into the problem. Similarly, during the last three or four months of the firm's operation, employee paychecks were not clearing due to insufficient funds.
 {¶ 43} Next, Gurwin verified that Stone worked for appellant until around 1995. Gurwin then testified about moving to Brunner's law offices. Brunner was interested in picking up the collections practice and spoke with Gurwin about the transition. Gurwin had understood that appellant would not be involved in the collections business. Gurwin became angry when Brunner indicated that appellant could obtain the collections business in the future. Eventually, Brunner terminated the relationship with Gurwin and Rodgers. Appellant was present during the termination meeting, but did not say anything during the meeting.
 {¶ 44} Gurwin testified that he could recognize appellant's handwriting, and identified appellant's signature as a drawer on checks from the firm's general account in regards to the Alazar estate. Gurwin then surmised that appellant printed "AGENT FOR PAYEES" as an endorsement on the Grange Insurance Company settlement check for $15,000 issued to "FAITH BARNES AND HER ATTORNEY PERRY R. SILVERMAN CO., L.P.A. AND TREASURER, STATE OF OHIO (ODJSF [sic] — TORT)." (State's Exh. C1 at 486.) Gurwin also identified appellant's printing on a deposit slip for the $15,000 settlement check.
 {¶ 45} On cross-examination, Gurwin admitted to asking for raises and bonuses for him and Rodgers. Likewise, Gurwin admitted to signing as a drawer the $30,000 check to Gosh Enterprises, Inc., that did not clear due to insufficient funds.
 {¶ 46} John Jones testified to the following on appellee's behalf. Jones was involved in an automobile accident in 2001. Jones is disabled and has Huntington's disease. Jones hired appellant to handle his personal injury case. The parties agreed that appellant's fee would constitute one-third of any recovery, and Jones also expected that appellant would pay Jones' medical bills. The case settled for approximately $12,500, and, in appellant's presence, Jones signed a release to recover the settlement. Jones received no money from appellant, and appellant did not pay Jones' medical bills. At the time of the settlement, Jones asked appellant about doing some additional legal work for him. Appellant never did the work.
 {¶ 47} On cross-examination, appellant asked if Jones remembered appellant indicating that the liability insurer would only release $7,500 of the settlement money because the remaining amount went to pay for liens. Appellant also asked if Jones remembered agreeing to apply the remaining money from the settlement to the additional legal work that Jones requested. Jones did not recall either scenario.
 {¶ 48} Attorney David Goldstein testified on behalf of appellee. Goldstein practices personal injury law, and Goldstein described the ethical obligation for an attorney to hold settlement funds in a trust account while subrogation claims are being resolved. Goldstein also testified that:
* * * I cannot think of any situation in my practice or in any situation that I would be required or need to draw cash out of my [trust] account. Generally, when I earn my funds, I write a check from my [trust] account made payable to my law firm and deposit the check.
(Vol. III Tr. at 527.)
 {¶ 49} Lashone Stepney testified to the following on appellee's behalf. Stepney works for OTRU, a private company that contracts with the state of Ohio to recover Medicaid expenditures. OTRU sent appellant a letter agreeing to discharge a $30,000 subrogation lien against Barnes if it received $15,000 within 30 days. OTRU received no payments to satisfy the lien. OTRU also sent appellant a letter denoting a $45,000 subrogation claim against Pollard for Medicaid expenditures. Again, OTRU received no payments to satisfy the claim.
 {¶ 50} Columbus Police Detective Cynthia Shaw testified for appellee that she investigated appellant's case and obtained Perry R. Silverman Co., L.P.A.'s bank records. Detective Shaw stated that she had reviewed all of the records during her investigation, and she identified them at trial. The records indicate the following.
 {¶ 51} As for Jones' case, a $7,500 settlement check was deposited into Perry R. Silverman Co., L.P.A.'s general trust account on March 10, 2004. The reverse side of the check bears an endorsement stamp of the firm's name and the printed words "AGENT FOR PAYEE." (State's Exh. U.)
 {¶ 52} As for the Capital Plus, Inc., case, an $85,653.09 check was deposited into Perry R. Silverman Co., L.P.A.'s general trust account on May 3, 2002. Within days, $44,100 was withdrawn from the account by checks bearing the notation "CPI v. Teague." (State's Exh. A12.)
 {¶ 53} As for Pollard's case, a $100,000 check was deposited into Perry R. Silverman Co., L.P.A.'s general trust account on September 9, 2002. Contemporaneously, numerous checks totaling over $37,000 were drawn from the general trust account, each payable to Perry R. Silverman Co., L.P.A. The next day, a check for $47,000 was drawn on the general trust account payable to Perry R. Silverman Co., L.P.A., and stating "Attorney fee" on the memo line. (State's Exh. B1 at 165.) A similar check for $16,000 was drawn on the same account a few days later.
 {¶ 54} As for Myers' case, a $250,000 check was deposited into the firm's general trust account on July 17, 2001. By the end of August 2001, the balance on this account was under $9,000. Indeed, within a month of the deposit, three checks totaling about $30,000 were drawn on the firm's general trust account, each payable to Perry R. Silverman Co., L.P.A.
 {¶ 55} As for Barnes' case, a $12,500 check was deposited into the firm's general trust account on November 27, 2002. That same day, a check for $10,000 was drawn on the account, payable to Perry R. Silverman Co., L.P.A., and stating "Accident of 6-6-01" on the memo line. (State's Exh. B3 at 339.) Two days later, the balance on the account was about $170. In December 2002, four checks totaling $26,000 were drawn from the general trust account, each payable to Perry R. Silverman Co., L.P.A., and each stating "Accident of 6-6-01" on the memo line. (State's Exh. B4 at 275, 276, and 283.) On September 30, 2003, a settlement check for $15,000 was deposited in the general trust account. As noted above, the check was issued to "FAITH BARNES AND HER ATTORNEY PERRY R. SILVERMAN CO., L.P.A. AND TREASURER, STATE OF OHIO (ODJSF [sic] — TORT)." (State's Exh. C1 at 486.) By the end of October 2003, the account balance was less than $400.
 {¶ 56} As for Powell's case, a $45,000 check was deposited into the firm's general trust account on February 3, 2004. The next day, a check for $7,000 was drawn on the account, payable to Perry R. Silverman Co., L.P.A., and stating "Accident of 6/15/2003" on the memo line. (State's Exh. C5 at 843.) By the end of March 2004, the balance on the account was about $1,600.
 {¶ 57} As for Chitwood's case, two checks totaling $104,457 were deposited into the firm's general trust account on January 31, 2003. Within a month, the balance on the account was slightly over $600. Also, within a month, numerous checks totaling $57,200 were drawn on the general trust account, each payable to Perry R. Silverman Co., L.P.A., and each stating "Automobile accident of 12/11/2002" on the memo line. (State's Exh. B7 at 823-829.)
 {¶ 58} As for the Millers' case, a $100,000 check was deposited into the firm's general trust account on February 5, 2004. Over the next three days, five checks totaling $120,000 were written to Perry R. Silverman Co., L.P.A. By the end of February 2004, the balance on this account was about $12,000.
 {¶ 59} As for the Gosh Enterprises, Inc., case, a $40,000 check was deposited into Perry R. Silverman Co., L.P.A.'s collection trust account on October 31, 2003. By the end of November 2003, the balance on this account was about $60. In mid-December 2003, a handwritten bank check for $2,100 was drawn on the account payable to "Cash." (State's Exh. B13 at 478.) Appellant's driver's license number was on the back of the check.
 {¶ 60} Lastly, as for the Alazar estate, a $700,000 check from Coregis Insurance Company was deposited into the Perry R. Silverman Co., L.P.A., general trust account on November 10, 2000. Between November 10, 2000 and January 31, 2001, a series of checks totaling over $200,000 were drawn on the account, each payable to Perry R. Silverman Co., L.P.A., and each referencing the Alazar estate on the memo line. On January 17, 2002, State Farm issued a settlement check for $100,000 payable to the Alazar estate and appellant. The check was deposited into the firm's general trust account on January 17, 2002. In the five days after the State Farm settlement check was deposited, three checks totaling $43,000 were drawn on the firm's general trust account, each payable to Perry R. Silverman Co., L.P.A., and each referencing the Alazar estate on the memo line. The money that Coregis Insurance Company provided for the court-ordered annuity was not reflected in the bank records because the insurance company sent the money directly to the annuity company.
 {¶ 61} During her testimony, Detective Shaw began to indicate that she felt there was consistency in the handwriting on the checks. Appellant objected, but the trial court overruled the objection, stating:
Well, we've had paralegals with no handwriting training talking about whether or not signatures were yours, so I'm going to overrule the objection. I think we might as well further clutter the record with lay opinion.
(Vol. IV Tr. at 755.) Detective Shaw then testified that, "[w]hether or not those are actually [appellant's] signatures, no, I can't attest to that, but they purportedly bore his signature." (Vol. IV Tr. at 756.)
 {¶ 62} Next, John Waddy testified to the following on appellee's behalf. Waddy is an attorney who was co-counsel on the Alazar estate case. Waddy also represented the family members of Alazar, except for Michael Mosley. Appellant gave Waddy his attorney fee, and appellant distributed money to the five family members that Waddy represented. Appellant was to handle Fatima Mosley's funds, and Waddy never saw the altered check for $233,196 to Fatima Mosley. Waddy also did not know about State Farm paying a $100,000 settlement, and Waddy never saw the settlement check until appellant's trial. Waddy indicated that he would be entitled to a fee from the State Farm settlement.
 {¶ 63} On cross-examination, Waddy testified to receiving a phone call from appellant after the August 28, 2003 contempt hearing. Appellant was crying and asked if Waddy knew of anywhere that he could borrow $300,000.
 {¶ 64} Thereafter, appellee rested its case. Upon resting its case, appellee moved for admission of exhibits, including Exhibit T, which the trial court admitted over appellant's objection. Appellee also moved to dismiss two of the theft counts, and the trial court granted the motion.
 {¶ 65} Thereafter, Deri Adair testified to the following on appellant's behalf. Adair worked for appellant from November 2001 to April 2003. Adair had heard Rodgers say that she could duplicate appellant's signature, and Adair never saw appellant intercept outgoing mail. Likewise, Adair reviewed the printing and signatures on the bank records that Detective Shaw obtained, and Adair only recognized appellant's signature as a drawer on four checks. The four checks did not pertain to the existing charges.
 {¶ 66} James Moorer, a friend of appellant's, testified for appellant that he had heard Gurwin state, on at least two occasions, that he "pretty much ran everything in the office." (Vol. IV Tr. at 829.) Appellant's sister-in-law, Marcie Klarin-Gold, also testified that Gurwin purported to run appellant's law office because appellant was "asleep." (Vol. IV Tr. at 834.)
 {¶ 67} Ruth Silverman, appellant's wife, testified to the following on appellant's behalf. Mrs. Silverman had noticed blank checks in Gurwin's office, and Gurwin told Mrs. Silverman that he took care of the financial management for the firm. Gurwin also stated that he had control over all of the firm's accounts, that he managed the collections business, that he hired and fired people, that he made all of the decisions, and that appellant was just the lawyer. Mrs. Silverman stated that Gurwin and Rodgers were eventually terminated for lying, for not depositing money when they were supposed to have deposited money, and for "a whole raft of other smaller reasons." (Vol. IV Tr. at 888.) Mrs. Silverman also identified Gurwin's signature as a drawer on the $30,000 check to Gosh Enterprises, Inc., that did not clear due to insufficient funds. Mrs. Silverman also discussed the personal issues and health problems that preoccupied appellant.
 {¶ 68} After Mrs. Silverman's testimony, appellant asked appellee to stipulate to the authenticity of an attorney fee contract with Myers and a subrogation agreement with Barnes. The trial court was concerned that appellant did not disclose the documents during pre-trial discovery, and the trial court reserved ruling on the documents' admissibility.
 {¶ 69} Next, Brunner testified to the following on appellant's behalf. Brunner is an attorney whom the Ohio Supreme Court appointed to oversee appellant's law practice during appellant's disciplinary proceedings. In overseeing the practice, Brunner was concerned that Gurwin was "interfering with deposits of the firm[.]" (Vol. V Tr. at 974.) Likewise, the collections business "was going in the hole month after month after month for huge numbers" while Gurwin and Rodgers were "earning way over industry standards[.]" (Vol. V Tr. at 976.) Brunner recommended that appellant terminate the employment of Gurwin and Rodgers, and the termination occurred in March 2004.
 {¶ 70} Lastly, Ray Fraley testified to the following on appellant's behalf. Fraley was chief document examiner for the Columbus Police Department from 1962 until 1983. Fraley compared the printing and signatures on bank records that appellee obtained, along with a handwriting exemplar that appellant provided. Fraley could not provide "a good basis for comparison" because he was analyzing copied bank records that prevented him from "determin[ing] the pressure [and] the line quality" of the signatures. (Vol. V Tr. at 1072.) However, upon comparing records known to contain Gurwin's printing, Fraley surmised that Gurwin printed the following check endorsements: (1) "AGENT FOR PAYEES" on the $100,000 State Farm settlement check; (2) "AGENT FOR WILLIAM CHITWOOD" on Chitwood's $100,000 settlement check; (3) "AGENT FOR PAYEE MARK POLLARD" on Pollard's $100,000 settlement check; (4) "AGENT FOR PAYEE" on Jones' $7,500 settlement check; (5) "AGENT FOR FAITH BARNES" on Barnes' $12,500 settlement check, and (6) "AGENT FOR" on the $15,000 check to Barnes, Perry R. Silverman Co., L.P.A., and the Treasurer of the State of Ohio. (State's Exh. A10 at 45; B6 at 817; B1 at 164; U; B3 at 332; C1 at 486.)
 {¶ 71} After appellant rested his case, the trial court decided not to admit into evidence the attorney fee contract with Myers and the subrogation agreement with Barnes because appellant did not properly authenticate the documents. The trial court also did not admit into evidence a Bureau of Workers' Compensation document regarding amounts the bureau paid to Myers for lost wages and medical expenses. The trial court concluded that the document was not authenticated. The trial court also noted a discovery issue arising from appellant's failure to disclose the workers' compensation document during pre-trial discovery.
 {¶ 72} Thereafter, the trial court found appellant guilty of all the non-dismissed charges. The trial court emphasized that its decision was "independent of * * * any finding of violations of ethics rules or of the duties of a civil nature owed by a member of the bar to his or her clients." The trial court also discounted Fraley's expert testimony, noting that "without actual, original signatures, showing three-dimensional pressure points and all of the subtleties of someone's signature, it is usually impossible to draw meaningful conclusions about forgery."
 {¶ 73} At the July 28, 2005 sentencing hearing, Myers told the court that he began suffering from depression after appellant stole from him and has even contemplated suicide. Likewise, appellee reiterated that Chitwood lost his house of 30 years. The trial court sentenced appellant to a total of 18 years imprisonment, imposed a total of $150,000 in fines, and ordered appellant to pay restitution to his victims. The trial court included in its order of restitution the attorney fees that would have been owed to appellant, thus forfeiting appellant's entitlement to those fees.
 {¶ 74} Subsequently, appellant filed a motion for new trial claiming that his trial counsel failed to interview certain witnesses as appellant had requested, failed to provide appellee complete discovery, provided inadequate cross-examination on several of appellee's witnesses, and improperly stipulated "to copies of checks which resulted in the original documents not being available for handwriting expert Ray Fraley to review." (Silverman Affidavit.) However, the trial court denied the motion. In addressing trial counsel's alleged failure to provide adequate cross-examination on several of appellee's witnesses, the trial court disagreed, noting a strategic decision to get particular witnesses off the stand, e.g., Barnes, Pollard, and Chitwood, who were "sympathetic and credible[,]" and Reddington, who was a "dangerous witness[.]"
 {¶ 75} Appellant appeals, raising nine assignments of error:
1. The trial court erred in permitting lay witness testimony on the subject of handwriting analysis.
2. The trial court erred in giving sentences which were not minimum sentences.
3. The trial court erred in giving consecutive sentences totaling eighteen years to a first-offender who was convicted of theft and related non-violent crimes.
4. The verdicts of guilty were against the manifest weight of the evidence.
5. The verdicts of guilty were not supported by sufficient evidence.
6. Defendant-Appellant Perry R. Silverman was deprived of effective assistance of counsel.
7. The trial court erred in admitting into evidence a "transcript" of a hearing in probate court which was not appropriately attested and certified by a court reporter.
8. The trial court erred in ruling that the fees to which Perry R. Silverman's clients had agreed in written contracts were forfeited and/or subject to a restitution order.
9. The trial court erred in assessing fines in these cases.
 {¶ 76} We begin with appellant's seventh assignment of error, which concerns Exhibit T, a transcript made from a digital recording of the August 28, 2003 probate court contempt hearing. Appellant asserts that the trial court committed prejudicial error by admitting into evidence Exhibit T. We disagree.
 {¶ 77} Appellant first argues that appellee failed to authenticate Exhibit T. The transcript does not contain the court reporter's signature on the certification page, which would have otherwise verified that the document is the court reporter's "stenographic transcription of the aforesaid probate court digital record of hearing." (State's Exh. T at 95.) Evidence must be properly authenticated before it is admissible into evidence. Evid.R. 901(A). We reverse the trial court's determination on an authentication issue only if we find an abuse of discretion.State v. Easter (1991), 75 Ohio App.3d 22, 26.
 {¶ 78} Evid.R. 902 contains self-authentication provisions involving certified records, but these provisions do not apply here because the court reporter did not certify the contempt hearing transcript. Alternatively, under Evid.R. 901(A), authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." "This low threshold standard does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be." (Emphasis added.) Easter at 25. Likewise, for Evid.R. 901 authentication purposes, "[t]he common manner of identifying a document is through testimony of a witness with knowledge." St. Paul Fire Marine Ins. Co. v. OhioFast Freight, Inc. (1982), 8 Ohio App.3d 155, 158.
 {¶ 79} Here, Reddington attended the August 28, 2003 contempt hearing, and, therefore, he had knowledge about what individuals said at the hearing. Reddington also reviewed Exhibit T and listened to the digital recording of the hearing. In doing so, Reddington verified that Exhibit T fairly and accurately depicted what transpired at the hearing. Reddington also testified that no "substantial variances" existed between the digital recording and the transcript. (Vol. II Tr. at 255.) Through such verifications, Reddington established that Exhibit T is what appellee claimed it to be, i.e., a transcript of the August 28, 2003 contempt hearing. See Evid.R. 901(A); Easter at 25. Thus, we conclude that Reddington properly authenticated Exhibit T for purposes of admitting it into evidence, and the trial court did not abuse its discretion in concluding that appellee authenticated the transcript. In so concluding, we note that, contrary to appellant's assertions, the transcript's notations of inaudible portions of the recording did not hinder Reddington's ability to authenticate the exhibit, given that the exhibit, overall, denoted significant discourse between individuals participating at the hearing.
 {¶ 80} Next, appellant claims that Exhibit T contains inadmissible hearsay. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is not admissible except as provided, in pertinent part, by the evidentiary rules. Evid.R. 802. Here, in raising the hearsay argument, appellant asserts that Exhibit T consists of "hearsay containing hearsay based upon hearsay." Specifically, appellant claims that Exhibit T conveys hearsay by conveying statements on the digital recording, and appellant argues that the digital recording itself conveys hearsay by conveying statements from the contempt hearing. As appellant recognizes, hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Evid.R. 805.
 {¶ 81} In response, appellee argues that the transcript is admissible under the public records exception in Evid.R. 803(8), which states:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.
 {¶ 82} As applied to this case, while a transcript of a formal proceeding is itself hearsay, United States v. Arias
(C.A.9, 1978), 575 F.2d 253, 254, the public records exception in Evid.R. 803(8) allows the admission of the transcript. SeeArias at 254 (analyzing similarly worded Fed.R.Evid. 803[8]); see, also, Trustees of the Univ. of Pennsylvania v. LexingtonIns. Co. (C.A.3, 1987), 815 F.2d 890, 905 (same). In that respect, contrary to appellant's assertions, we find irrelevant to the hearsay analysis that Exhibit T is a transcription of the digital recording of the contempt hearing, and not a direct transcription of the hearing. In the end, the transcript is a "record" of the probate court's activities, and, thus, it falls within the purview of Evid.R. 803(8) in accordance with Arias
and Lexington Ins. Co.
 {¶ 83} Nevertheless, Evid.R. 803(8) does not apply to the testimony contained within the transcript. State v. Jack (Apr. 23, 1998), Athens App. No. 97CA10. Rather, hearsay statements contained within a public record are not admissible unless the statements themselves are subject to a hearsay exception. Statev. Walker (Nov. 8, 1989), Summit App. No. 14012. Thus, we must determine whether each statement transcribed by the court reporter survives hearsay analysis.
 {¶ 84} Here, appellant's own statements in Exhibit T are admissible under Evid.R. 801(D)(2)(a) as admissions of a party opponent. Likewise, questions from Buchman and Judge Belskis in Exhibit T do not constitute hearsay. See State v. Young (Apr. 12, 2001), Cuyahoga App. No. 78058. Thus, the trial court properly admitted into evidence from Exhibit T statements by appellant and questions from Buchman and Judge Belskis.
 {¶ 85} In reviewing the statements in Exhibit T from Mosley and statements (not questions) from Judge Belskis and Buchman, we recognize that Evid.R. 804(B)(1) allows for the admission of non-party opponent statements in prior court proceedings. However, Evid.R. 804(B)(1) only applies to a declarant unavailable as a trial witness. Thus, Evid.R. 804(B)(1) does not apply to admit statements that Mosley made during the contempt hearing because Mosley actually testified at appellant's trial. Nonetheless, we find the admission of statements from Mosley via Exhibit T to be harmless. Under the harmless error doctrine, trial error is harmless if the error did not affect a defendant's "substantial rights[.]" State v. Perry, 101 Ohio St.3d 118,2004-Ohio-297, at ¶ 15. Stated another way, harmless error is any error that does not affect the outcome of the case. State v.Muttart, Hancock App. No. 5-05-08, 2006-Ohio-2506, citing Statev. Brown, 100 Ohio St.3d 51, 2003-Ohio-5059.
 {¶ 86} As to Mosley's statements contained within Exhibit T, we note that Mosley discussed the August 28, 2003 contempt hearing at trial. Thus, overall, Mosley's statements in Exhibit T were already properly before the trial court, and such statements did not prejudice appellant or otherwise affect the outcome of the trial. See State v. Loch, Franklin App. No. 02AP-1065, 2003-Ohio-4701, at ¶ 14. One statement Mosley made at the contempt hearing, but not at trial, was an indication that some court documents referred to Fatima Mosley as Fatima Alazar. However, we find that such a statement was fleeting and innocuous and, as a result, had no impact on the outcome of appellant's case. See State v. Furry (Feb. 28, 1990), Medina App. No. 1834.
 {¶ 87} Arguably, Evid.R. 804(B)(1) does not apply to admit Buchman's statements at the contempt hearing because the record does not fully establish whether Buchman would not have been available as a witness due to his status as prosecutor in appellant's case. Regardless, we find that the admission of statements from Buchman via Exhibit T was harmless. Buchman essentially told Judge Belskis that appellee could obtain bank information about money missing from the Alazar estate. Such a statement was fleeting and innocuous and, as a result, had no impact on the outcome of appellant's case. See Furry.
 {¶ 88} Evid.R. 804(B)(1) does not apply to Judge Belskis' statements because the record does not evince whether the judge would not have been available as a witness. But, again, we find the admission of Judge Belskis' statements via Exhibit T to be harmless. Overall, information conveyed from Judge Belskis' statements was already before the trial court through testimony from Mosley and Reddington, and, therefore, such statements did not prejudice appellant or otherwise affect the outcome of the trial. See Loch at ¶ 14.
 {¶ 89} We recognize that the trial testimony did not include Judge Belskis' contempt hearing statement that appellant breached his duties as an attorney for the Alazar estate. However, we find no prejudice from such a statement because the trial court acknowledged that the criminal matter was independent of such circumstances concerning: (1) appellant's civil responsibilities as an attorney; and (2) appellant's failure to adhere to attorney ethical obligations.
 {¶ 90} In summary, we conclude that appellee properly authenticated Exhibit T, and we find admissible from Exhibit T appellant's statements and questions from Buchman and Judge Belskis. We also find that the trial court's admission of statements from Mosley, Buchman, and Judge Belskis via Exhibit T was harmless error. Therefore, we overrule appellant's seventh assignment of error.
 {¶ 91} We next address appellant's first assignment of error, where appellant contends that the trial court erred by allowing Rodgers and Gurwin to opine that certain checks admitted into evidence contained appellant's signature as the drawer on Perry R. Silverman Co., L.P.A., accounts. We disagree.
 {¶ 92} A trial court has broad discretion in the admission of evidence, and we will not reverse the trial court's decision absent an abuse of discretion. State v. Issa (2001),93 Ohio St.3d 49, 64. An abuse of discretion connotes more than an error of law or judgment; it entails a decision that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 93} In challenging the trial court's decision to admit Rodgers' and Gurwin's opinions on appellant's signature, appellant asserts that the trial court subsequently criticized its decision to allow such testimony. Appellant also notes that Rodgers and Gurwin provided the opinions after not seeing appellant's signature for over a year, and appellant notes that the witnesses were biased against him because he had accused them of the thefts. Likewise, appellant challenges Rodgers' and Gurwin's opinions with Fraley's indication that a comparison of signatures could not be made from the copied bank records. Similarly, appellant notes that Adair testified that appellant did not sign as a drawer the checks related to appellant's convictions. However, such conflicting information relates to the manifest weight of Rodgers' and Gurwin's opinions, not their admissibility. See State v. Cook, 149 Ohio App.3d 422,2002-Ohio-4812, at ¶ 29.
 {¶ 94} In so concluding, we note that appellee argues that Rodgers' and Gurwin's opinions are admissible under Evid.R. 901(B)(2), which allows "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation." However, Evid.R. 901 applies to the authentication of a document, which is a requirement preceding admissibility where the party establishes that the document is what the party claims it to be. State v. White,
Scioto App. No. 03CA2926, 2004-Ohio-6005, at ¶ 59. Here, appellee authenticated all of the bank records through Detective Shaw when she verified that she received and reviewed the bank records in the course of her investigation.
 {¶ 95} Conversely, Rodgers and Gurwin were not authenticating documents. Rather, appellee asked Rodgers and Gurwin to provide an opinion as to whether certain checks contained appellant's signature as the drawer. Therefore, we review the testimony of Rodgers and Gurwin under Evid.R. 701, which states:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.
 {¶ 96} Rodgers' and Gurwin's opinions were rationally based on their perceptions given that they worked with appellant for several years and verified that they recognized appellant's handwriting. Rodgers' and Gurwin's opinions were "helpful to * * * the determination of a fact in issue" given that the opinions aided the trial court in determining appellant's culpability. Evid.R. 701. Thus, Rodgers' and Gurwin's opinions were admissible under Evid.R. 701, and we overrule appellant's first assignment of error.
 {¶ 97} We next address appellant's fourth and fifth assignments of error, which concern his convictions. Appellant first maintains that his convictions are based on insufficient evidence. We disagree.
 {¶ 98} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997),78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307; State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact.Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 99} Based on our discussion in appellant's seventh assignment of error, we review the evidence in this case with no regard to statements from Mosley, Buchman, and Judge Belskis conveyed via Exhibit T, the transcript of the August 28, 2003 probate court contempt hearing. First, we note that the trial court convicted appellant on ten theft counts. Appellee alleged that appellant committed: (1) third-degree felony theft by stealing $100,000 or more against the Alazar estate; (2) second-degree felony theft by stealing $25,000 or more from Myers, a disabled adult; (3) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Capital Plus, Inc.; (4) second-degree felony theft by stealing $25,000 or more from Pollard, a disabled adult; (5) second-degree felony theft by stealing $25,000 or more from Barnes, a disabled adult; (6) second-degree felony theft by stealing $25,000 or more against Chitwood, a disabled adult; (7) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Gosh Enterprises, Inc.; (8) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from Powell; (9) fourth-degree felony theft by stealing $5,000 or more, but less than $100,000, from the Millers; and (10) third-degree felony theft by stealing $5,000 or more, but less than $25,000, from Jones, a disabled adult.
 {¶ 100} R.C. 2913.02 defines theft and states:
(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
(1) Without the consent of the owner or person authorized to give consent;
(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
(3) By deception[.]
 {¶ 101} "Deprive" means to do any of the following:
(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;
(2) Dispose of property so as to make it unlikely that the owner will recover it[.]
R.C. 2913.01(C).
 {¶ 102} In examining the theft charges, we note that the charges are based on circumstantial evidence. Circumstantial evidence is the "proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." State v.Bentz (1981), 2 Ohio App.3d 352, 355, fn. 6, citing 1 Ohio Jury Instructions (1968), Section 5.10(d). Circumstantial evidence has probative value equal to direct evidence. State v. Nicely
(1988), 39 Ohio St.3d 147, 151. Similarly, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." Bourjaily v.United States (1987), 483 U.S. 171, 179-180. Here, we conclude that sufficient evidence supports appellant's theft convictions when considering the "cumulation" of the "individual pieces of evidence," pursuant to Bourjaily, and viewing the evidence in the light most favorable to appellee, pursuant to Jenks.
 {¶ 103} As the testimony and exhibits establish, the above clients, including the Alazar estate, did not receive all of their due settlement money from appellant; indeed, some of the clients received none of the settlement money. Similarly, in some instances, subrogation liens went unpaid. And, in some instances, the clients received a check in an amount to cover a portion of the settlement, but the check did not clear due to insufficient funds. Although the clients were not receiving their money, most, if not all, of the clients' funds disappeared from Perry R. Silverman Co., L.P.A.'s general trust account soon after each deposit of the funds. Through such evidence, the trial court could properly conclude that the clients were theft victims, and, as below, the trial court could tie the thefts to appellant.
 {¶ 104} Appellant played an active and personal role in the settlement issues with his clients. As an example, appellant met with Barnes, Powell, and the Millers to have them sign over their settlement checks for deposit in the general trust account. In addition, appellant showed Myers his settlement check, but appellant indicated that he needed to hold the check. Moreover, Powell, Myers, Barnes, Pollard, Chitwood, and Setzer testified that they spoke with appellant in their futile attempts to obtain all of their money. The record also establishes that appellant would provide some of the clients portions of their settlement money, and appellant was the one who provided some of the clients the checks bearing insufficient funds. As an example, appellant delivered a check to Velie, but the check did not clear due to insufficient funds.
 {¶ 105} Similarly, appellant played an active role with the firm's bank accounts. Appellant chose the banks the firm would use, and Gurwin testified that appellant reconciled all of the firm's accounts except for the court cost account. Rodgers and Gurwin also identified appellant's signature as a drawer on some of the checks pertaining to the Alazar account, and Gurwin identified appellant's printing as an endorsement on the $15,000 settlement check to Barnes, Perry R. Silverman Co., L.P.A., and the treasurer of the state of Ohio. Gurwin also identified appellant's printing on a bank deposit slip pertaining to the $15,000 Barnes' settlement check. The record also establishes that, in mid-December 2003, a handwritten check for $2,100 bearing appellant's driver's license number was drawn on the firm's collections trust account.
 {¶ 106} In addition, appellant engaged in furtive conduct reflective of a consciousness of guilt. See State v. Hurst
(Mar. 7, 2000), Franklin App. No. 98AP1-549. As an example, appellant gave Myers and Velie different excuses as to why they had not received all of the money owed them. Moreover, in one instance, appellant delivered a check to Myers at a local bank, but appellant had Myers cash the check at a check cashing service instead. The check cashing service employee initially refused to cash the check due to insufficient funds, but the employee eventually relented after speaking with appellant on the phone and taking an $800 fee. Additionally, appellant concealed the $100,000 State Farm settlement on the Alazar estate, appellant provided a copy of an altered check to try to deceive the probate court into thinking that he issued a $223,196 check to Fatima Mosley, and appellant never told Chitwood about a $4,457 settlement.
 {¶ 107} As for the amounts that appellee alleged appellant stole, we note that, with respect to some clients, the trial court's decision did not explicitly state that the amounts of the thefts included forfeited legal fees. However, in other instances, the trial court did include the forfeited legal fees in its theft calculations. We need not address whether the legal fees should be included in the alleged theft amounts because, even without the inclusion of the legal fees in any of the theft convictions, the above testimony and bank records evince that appellant stole the amounts alleged in the indictment, and appellant has not argued otherwise.
 {¶ 108} We further note that the indictment enhances the degree of the theft offenses against Myers, Barnes, Jones, Pollard, and Chitwood due to their disabilities and pursuant to R.C. 2913.02(B)(3). These witnesses testified about their disabilities, and, therefore, we conclude that the record supports the indicted disability enhancements.
 {¶ 109} We next review appellant's fourth-degree felony forgery conviction. R.C. 2913.31(A)(2) defines forgery as:
(A) No person with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
* * *
(2) Forge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act * * *.
Forgery is a fourth-degree felony if the "value of the property or services or the loss to the victim is five thousand dollars or more and is less than one hundred thousand dollars[.]" R.C.2913.31(C)(1)(b)(i).
 {¶ 110} Here, Grange Insurance Company issued a $15,000 check to "FAITH BARNES AND HER ATTORNEY, PERRY R. SILVERMAN CO., L.P.A., AND TREASURER, STATE OF OHIO (ODJSF [sic] — TORT)." The check contains an endorsement from Barnes and a stamped endorsement from Perry R. Silverman Co., L.P.A., to appellant's law firm general trust account and, under the stamp, the printed words "AGENT FOR PAYEES." No one from the state of Ohio or the OTRU endorsed the check, and appellant paid no money to the state in regards to the agreed upon $15,000 owed on a Medicaid related lien. However, Gurwin identified appellant's printing on the endorsement section of the check and the deposit slip for the check. Moreover, the above evidence recognizing appellant's control over the settlement issues of his clients allows for a reasonable inference that appellant caused the check to be deposited into the general trust account with no authorization from the state of Ohio or the OTRU and with no intent to pay the Medicaid related lien. Based on the above, we conclude that sufficient evidence supports appellant's fourth-degree felony forgery conviction when considering the "cumulation" of the "individual pieces of evidence," pursuant to Bourjaily, and viewing the evidence in the light most favorable to appellee, pursuant to Jenks.
 {¶ 111} Next, we address the third-degree felony offenses of tampering with evidence, and tampering with records and falsification, which specifically concern the Alazar estate. First, we conclude that sufficient evidence supports appellant's convictions on two counts of tampering with evidence, R.C.2921.12(A)(2), which states that:
(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
* * *
(2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.
The tampering with evidence counts stem from appellant's distribution report to the probate court. Reddington confirmed that appellant filed the distribution report with the probate court, pursuant to court order, and, therefore, as a matter of ongoing official public business concerning the Alazar estate. The record establishes that one check copy presented in the distribution report for $223,196 to Fatima Mosley, was fabricated from a check for $5,000 to Perry R. Silverman Co., L.P.A., and another check copy, presented in the report to Perry R. Silverman Co., L.P.A., for $133,352, was fabricated from a check for $40,000 to Perry R. Silverman Co., L.P.A. Through such evidence, the trial court properly deduced that appellant, knowing about the ongoing proceedings concerning the Alazar estate, prepared the distribution report with copies of two falsified checks to mislead the probate court in its official business and to corrupt the outcome of the proceedings and investigations on the Alazar estate.
 {¶ 112} Similarly, we conclude that sufficient evidence supports appellant's conviction for falsification, R.C.2921.13(A)(9), which states:
(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:
* * *
(9) The statement is made with purpose to commit or facilitate the commission of a theft offense.
The falsification charge stems from appellant making false statements at the August 28, 2003 contempt hearing. At the hearing, appellant discussed the Fatima Mosley check and the whereabouts of its deposit, even though, as above, the copy of the check in the distribution report was actually falsified. Such evidence allows for an inference that appellant made false statements at the contempt hearing in a further attempt to facilitate the theft offense against the Alazar estate. Because the record establishes that the underlying theft offense against the Alazar estate involved money in an amount exceeding $100,000, the falsification conviction is a third-degree felony. See R.C.2921.13(F)(2).
 {¶ 113} Likewise, we conclude that sufficient evidence supports appellant's third-degree felony conviction for tampering with records, R.C. 2913.42(A)(1), which states:
(A) No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:
(1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record[.]
The above count again stems from appellant's distribution report to the probate court. As noted above, the record demonstrates that appellant tendered a report that referenced and contained copies of two falsified checks. Given that appellant did not disclose to Mosley and Waddy the $100,000 State Farm settlement, we may also deduce that appellant failed to disclose the State Farm settlement on the distribution report. Through such evidence, the trial court properly concluded that appellant falsified the distribution report with purpose to defraud the Alazar estate. The tampering with records conviction constitutes a third-degree felony because appellant falsified a record kept by a governmental agency, i.e., the probate court. R.C.2913.42(B)(4); see, also, State v. Zimmerman (Nov. 28, 1989), Auglaize App. No. 2-88-10 (holding that a writing was kept by a governmental agency under R.C. 2913.42 by stating that, "[w]hile it is true that any falsification of the writing involved * * * was made before the writing was presented to a governmental agency, the writing and falsification contained therein were prepared for submission to a governmental agency and was submitted to a governmental agency to be kept with its records * * * [i]t had only to do with the exercise of a governmental function"); see, also, State v. Ciha (Dec. 8, 1993), Lorain App. No. 92CA005507 (concluding that, under R.C. 2914.42, a bill submitted to a governmental agency constituted a "record kept by or belonging to the government" because the bill "was important to the proper functioning of the government").
 {¶ 114} Lastly, we conclude that sufficient evidence supports appellant's second-degree felony conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), which states:
(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *.
The above statute is also known as Ohio's Racketeer Influenced and Corrupt Organizations statute ("RICO"), which is based on the federal racketeer statute, Section 1962, Title 18, U.S.Code.State v. Schlosser (1997), 79 Ohio St.3d 329, 331-332. The mental state under R.C. 2923.32(A)(1) is strict liability.Schlosser at 331.
 {¶ 115} In indicting appellant for RICO, appellee alleged that appellant conducted the affairs of an enterprise, Perry R. Silverman Co., L.P.A., through a pattern of corrupt activity by committing theft and forgery crimes. In challenging the RICO conviction, appellant argues that there is insufficient distinction between him and the enterprise, Perry R. Silverman Co., L.P.A. In support, appellant advances Cedric KushnerPromotions, Ltd. v. King (2001), 533 U.S. 158. In Cedric, the United States Supreme Court held that, under the federal racketeer statute, proof must demonstrate the "existence of two distinct entities: (1) a `person'; and (2) an `enterprise' that is not simply the same `person' referred to by a different name." Id. at 161.
 {¶ 116} We have previously looked to federal case law for guidance in applying Ohio's RICO statute. State v. Teasley,
Franklin App. No. 00AP-1322, 2002-Ohio-2333, at ¶ 53. Yet, applying Cedric to appellant's case, we determine that Cedric
supports appellant's RICO conviction. In Cedric, the United States Supreme Court held that "an employee who conducts the affairs of a corporation through illegal acts comes within the terms of" the federal racketeer law "that forbids any `person' unlawfully to conduct an `enterprise[.]'" Id. at 163. "[T]he employee and the corporation are different `persons[.]' * * * After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." Id.
 {¶ 117} Here, by analogy, Perry R. Silverman Co., L.P.A., is a distinct legal entity from appellant. We recognize that attorneys are personally liable for a legal professional association's debts. See South High Development, Ltd. v. Weiner,Lippe Cromley Co., L.P.A. (1983), 4 Ohio St.3d 1. However, such a distinction is inapposite because, in the final analysis, the legal professional association does enjoy "rights, obligations, powers, and privileges" different from appellant.Cedric at 163. As an example, the professional association enjoys "the benefits of corporate treatment under the Internal Revenue Code[.]" Lehtinen v. Drs. Lehtinen, Mervart West,Inc., 99 Ohio St.3d 69, 2003-Ohio-2574, at ¶ 15. Further emphasizing a distinction between appellant and Perry R. Silverman Co., L.P.A., is that the legal professional association had other employees. While the legal professional association is not exactly a corporation, the association is a legal entity and, thus, falls within the definition of "enterprise" under RICO. R.C. 2923.31(C).
 {¶ 118} We also conclude that appellant conducted the affairs of Perry R. Silverman Co., L.P.A., through a pattern of corrupt activity by committing thefts and forgery. R.C. 2923.31(E) defines "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E) further states that "[u]nless any incident was an aggravated murder or murder, the last of the incidents forming the pattern shall occur within six years after the commission of any prior incident forming the pattern, excluding any period of imprisonment served by any person engaging in the corrupt activity." R.C. 2923.31(E) also requires that at least one of the incidents forming the pattern constitutes a felony.
 {¶ 119} Here, as above, from about November 2000 through July 2004, appellant conducted the affairs of Perry R. Silverman Co., L.P.A., to steal from ten clients in amounts totaling hundreds of thousands of dollars, to mislead the probate court to conceal his thefts, and to commit forgery. In accordance with R.C.2923.31(E), the acts, involving different clients and different amounts of money, did not constitute a "single event."
 {¶ 120} Recognizing such, we note that, under R.C.2923.31(E), the acts must not be isolated. See, also, H.J. Inc.v. Northwestern Bell Telephone Co. (1989), 492 U.S. 229, 239-240
(analyzing the federal racketeering statute and holding that a pattern of corrupt activity stems from acts that exhibit "relatedness" and "continuity"). Here, appellant's acts were not isolated, given that appellant used Perry R. Silverman Co., L.P.A., as a vehicle to commit the thefts and forgery, and the legal professional association provided appellant an office, bank accounts, and employees to pursue his illicit activities.
 {¶ 121} Accordingly, based on the above, we conclude that appellant's convictions are based on sufficient evidence. Next, appellant contends that his convictions are against the manifest weight of the evidence. Again, we disagree.
 {¶ 122} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror."Thompkins, at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Columbus v. Henry (1995),105 Ohio App.3d 545, 547-548. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins,
at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 123} In challenging his convictions as against the manifest weight of the evidence, appellant first argues that appellee failed to specifically trace the stolen money to appellant. However, R.C. 2913.02(A) only requires proof that appellant knowingly obtained or exerted control over property with purpose to deprive the owner of the property. Therefore, the thefts were complete once appellant exerted control over his clients' money as evinced above.
 {¶ 124} Appellant also argues that he was merely holding his clients' money to pay subrogation liens. However, we find this argument unpersuasive because subrogation liens were not paid and because most, if not all, the clients' funds disappeared from the law firm general trust account soon after each deposit of the funds.
 {¶ 125} Furthermore, appellant claims that the evidence actually points to Gurwin and Rodgers stealing the money. As an example, appellant notes that Gurwin claimed he was the one who ran appellant's collections business and that appellant was not aware of what was going on with the business. Appellant also references Brunner testifying that Rodgers and Gurwin were intercepting checks and Fraley testifying that Gurwin's printing was on the endorsement portion of "key checks," i.e., the check subject to the forgery charge, the State Farm settlement check to the Alazar estate, Chitwood's $100,000 settlement check, Pollard's $100,000 settlement check, Jones' $7,500 settlement check, and Barnes' $12,500 settlement check. Likewise, appellant notes that Rodgers admitted she could duplicate appellant's signature. Moreover, appellant asserts that, in contrast to testimony from Rodgers and Gurwin, Adair testified that appellant's signatures were not on the pertinent checks and that Fraley testified there was no basis to compare the signatures on the pertinent checks with the handwriting exemplar that appellant provided. However, the trial court had cause to discount such testimony and conclude that appellant nonetheless committed the above-noted crimes, given, as noted above, appellant's active and personal involvement in the settlement issues with his clients.
 {¶ 126} Lastly, appellant asserts that Romelfanger had a strong motive to make appellant look guilty to ensure that the bank was not financially liable for honoring forged checks. Romelfanger's testimony primarily concerned the copies of altered checks in the probate court distribution report. The trial court properly considered Romelfanger's testimony, given that the testimony was based on a comparison of the altered checks with legitimate bank records.
 {¶ 127} Therefore, based on the above, we conclude that appellant's convictions are not against the manifest weight of the evidence. Having also concluded that appellant's convictions are not based on insufficient evidence, we overrule appellant's fourth and fifth assignments of error.
 {¶ 128} We next address together appellant's second and third assignments of error. In his second and third assignments of error, appellant first argues that appellant's combined sentences of 18 years imprisonment constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. In support of the Eighth Amendment argument, appellant notes that he is merely a first offender in his fifties who has committed no crimes of violence in the instant case.
 {¶ 129} In State v. Weitbrecht (1999), 86 Ohio St.3d 368,370-371, the Ohio Supreme Court recognized:
The Eighth Amendment to the Constitution of the United States provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." * * * Historically, the Eighth Amendment has been invoked in extremely rare cases, where it has been necessary to protect individuals from inhumane punishment such as torture or other barbarous acts. Robinson v. California (1962), 370 U.S. 660,676, 82 S.Ct. 1417, 1425, 8 L.Ed.2d 758, 768. Over the years, it has also been used to prohibit punishments that were found to be disproportionate to the crimes committed. In McDougle v.Maxwell (1964), 1 Ohio St.2d 68, 30 O.O.2d 38, 203 N.E.2d 334, this court stressed that Eighth Amendment violations are rare. We stated that "[c]ases in which cruel and unusual punishments have been found are limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person." Id. at 70, 30 O.O.2d at 39, 203 N.E.2d at 336. * * *
 {¶ 130} Moreover, the Ohio Supreme Court in Weitbrecht
stated that for an Eighth Amendment Cruel and Unusual Punishment violation to occur:
* * * "[T]he penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community." Id.
See, also, State v. Chaffin (1972), 30 Ohio St.2d 13, 59 O.O.2d 51, 282 N.E.2d 46, paragraph three of the syllabus.
Weitbrecht at 371.
 {¶ 131} Courts use a tripartite analysis to assess whether the penalty imposed is disproportionate to the offense committed:
"First, we look to the gravity of the offense and the harshness of the penalty * * *. Second, it may be helpful to compare the sentences imposed on other criminals in the same jurisdiction. If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive. * * * Third, courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions." * * *
Weitbrecht at 371, quoting Solem v. Helm (1983),463 U.S. 277, 290-291.
 {¶ 132} A reviewing court need not reach the second and third prongs of the tripartite test except in the rare case when a threshold comparison of the crime committed and the sentence imposed lead to an inference that the two are grossly disproportionate. Weitbrecht at 373, fn. 4, citing Harmelin v.Michigan (1991), 501 U.S. 957, 1005 (Kennedy, J., concurring);State v. Keller (June 1, 2001), Montgomery App. No. 18411.
 {¶ 133} Appellant did not raise the Eighth Amendment argument below. Therefore, we may only reverse appellant's sentence if, under the Eighth Amendment analysis, the trial court's sentence rises to the level of plain error. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." State v. Barnes
(2002), 94 Ohio St.3d 21, 27. Under the plain error standard:
* * * First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Barnes at 27.
 {¶ 134} For the following reasons, we conclude that appellant's prison sentences are not "`shocking to any reasonable person.'" Weitbrecht at 371, quoting McDougle v.Maxwell (1964), 1 Ohio St.2d 68, 70. Similarly, we conclude that appellant's prison sentences are not grossly disproportionate to appellant's offenses. Weitbrecht at 371, fn. 4. Appellant took advantage of his position of trust by stealing from his clients. The clients relied on appellant to handle their sensitive legal matters and to provide them with the settlement money owed them. Appellant's crimes involved ten clients. The fact that appellant did not commit crimes of violence against his clients does not mitigate against the gravity of appellant's offenses given that appellant caused substantial financial harm to his clients, several of whom were disabled. Furthermore, many of appellant's clients are undergoing lasting effects from appellant's crimes. As an example, Chitwood lost his home and had to declare bankruptcy. Likewise, Myers began suffering from depression after appellant stole from him, and he contemplated suicide.
 {¶ 135} Based on the above, and considering the first prong of the tripartite test, we do not find that this is the rare case where a threshold comparison of the crimes that appellant committed and the sentences imposed leads to an inference that the two are grossly disproportionate. Thus, we need not perform the second and third elements of the tripartite test in ourEighth Amendment analysis. See Weitbrecht at 373, fn. 4. Therefore, we conclude that the trial court did not commit constitutional error, let alone plain error, under theEighth Amendment Cruel and Unusual Punishment Clause when it imposed 18 years imprisonment for appellant's offenses.
 {¶ 136} Next, appellant contends that the trial court erred by sentencing appellant to non-minimum, consecutive sentences under Ohio's felony sentencing statutes. In particular, appellant asserts that the trial court imposed the non-minimum, consecutive sentences in violation of jury trial principles afforded by theSixth Amendment to the United States Constitution and in contravention of Blakely v. Washington (2004), 542 U.S. 296.
 {¶ 137} Blakely stems from Apprendi v. New Jersey (2000),530 U.S. 466, 490, wherein the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Otherwise, the sentence violates a defendant's right to a jury trial under the Sixth Amendment to the United States Constitution and Fourteenth Amendment due process guarantees. Apprendi at 476-478, 497. In Blakely, the United States Supreme Court defined "`statutory maximum' forApprendi purposes" as "the maximum sentence a judge may imposesolely on the basis of the facts reflected in the jury verdictor admitted by the defendant." (Emphasis sic.) Blakely at 303.
 {¶ 138} Since appellant's sentencing, and since the parties submitted their appellate briefs, the Ohio Supreme Court decided the applicability of Blakely to Ohio's felony sentencing laws in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856. InFoster, the Ohio Supreme Court concluded that portions of Ohio's felony sentencing statues violate the Sixth Amendment to the United States Constitution in the manner set forth inBlakely. Foster at ¶ 50-83. In particular, the Ohio Supreme Court declared unconstitutional the statutes involved in appellant's case, which are statutes governing a trial court's imposition of: (1) non-minimum sentences on first time offenders, like appellant; and (2) consecutive sentences. See Foster at ¶ 83. Thus, in Foster, the Ohio Supreme Court severed the unconstitutional statutes from Ohio's felony sentencing laws. Id. at ¶ 99. The Ohio Supreme Court then concluded that cases pending on direct review "must be remanded to the trial courts for new sentencing hearings." Id. at ¶ 104.
 {¶ 139} In State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, at ¶ 7, we acknowledged the "broad language the Supreme Court of Ohio used in Foster when it ordered resentencing for all cases pending on direct review." However, we concluded that "a defendant who did not assert a Blakely
challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on Foster." Id. In concluding as such, we "consider[ed] the language used in UnitedStates v. Booker (2005), 543 U.S. 220, 125 S.Ct. 738, the case that Foster relied on in arriving at" its decision to sever the unconstitutional statutes from Ohio's felony sentencing laws. Id. "In Booker, the United States Supreme Court applied Blakely
to the Federal Sentencing Guidelines." Id. "The Booker Court applied its holding to all cases on direct review." Id. However, the Booker court "expected reviewing courts to apply `ordinary prudential doctrines,' such as waiver * * * to determine whether to remand a case for a new sentencing." Id., quoting Booker at 268. "Thus, in accordance with the well-settled doctrine of waiver of constitutional challenges, and the language inBooker," we held in Draughon that a "Blakely challenge is waived by a defendant sentenced after Blakely if it was not raised in the trial court." Draughon at ¶ 8.
 {¶ 140} Here, the trial court sentenced appellant after the United States Supreme Court issued Blakely. Thus, appellant could have objected to his sentencing based on Blakely and the constitutionality of Ohio's sentencing scheme. Appellant did not do so. Therefore, pursuant to Draughon, we conclude that appellant waived his Blakely argument on appeal. See Draughon
at ¶ 7.
 {¶ 141} Accordingly, based on the above, we need not reverse appellant's prison sentences on Eighth Amendment or Blakely
grounds. As such, we overrule appellant's second and third assignments of error.
 {¶ 142} Similarly, in his ninth assignment of error, appellant contends that the trial court erred by assessing a total of $150,000 in fines. We disagree.
 {¶ 143} Appellant did not object to the fines on any grounds, and we review the issue under the plain error standard noted above. Crim.R. 52(B); Barnes at 27. In challenging his fines, appellant first notes that R.C. 2929.18(A)(2) requires that a trial court impose a fine based upon a standard percentage of the offender's daily income over a period of time and based upon the seriousness of the offense. According to appellant, he will be unable to pay the fines because of his lengthy incarceration and because he lost the ability to practice law due to his ethics violations.
 {¶ 144} "`It is clear that the court should consider the impact a fine has on the offender[.]'" State v. Annotico (Dec. 14, 2000), Cuyahoga App. No. 76202, quoting State v. Frazier
(Oct. 9, 1997), Cuyahoga App. No. 71675-78. However, we need not disturb appellant's fines on grounds of his inability to pay, given that appellant requested no opportunity to demonstrate to the trial court his financial situation. Annotico. In further rejecting appellant's argument, we note that the trial court did indicate in its judgment entries that it considered appellant's present and future ability to pay the fines. Moreover, we reject appellant's challenge of the fines to the extent that appellant argues the trial court needed to specifically denote at the sentencing hearing that it considered a standard percentage of appellant's daily income over a period of time or that it generally considered appellant's future and ability to pay the fines. The trial court is not required to make specific findings when issuing fines. State v. Adkins (2001),144 Ohio App.3d 633, 647; State v. Southerland (Apr. 22, 2002), Butler App. No. CA2001-06-153. Thus, we find no error, let alone plain error, in the trial court's adherence to its statutory obligations when imposing the fines on appellant.
 {¶ 145} Next, appellant claims that his fines constitute cruel and unusual punishment under the Eighth Amendment. However, based on our above Eighth Amendment analysis, we find no error, let alone plain error, to indicate that the trial court unconstitutionally imposed the fines on appellant. Similarly, based on our above Eighth Amendment analysis, we find no error, let alone plain error, to indicate that the trial court unconstitutionally imposed the fines with the term of incarceration on appellant. Accordingly, we overrule appellant's ninth assignment of error.
 {¶ 146} We next address appellant's sixth assignment of error, where appellant claims that his former trial counsel's performance constituted ineffective assistance of counsel. We disagree.
 {¶ 147} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel.Strickland v. Washington (1984), 466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 148} A properly licensed attorney is presumed competent.State v. Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, at ¶ 88, citing Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301. Moreover, there is "`a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" State v. Bradley (1989), 42 Ohio St.3d 136,142, quoting Strickland at 689. In matters regarding trial strategy, we will generally defer to defense counsel's judgment.State v. Carter (1995), 72 Ohio St.3d 545, 558; see, also,State v. Carpenter (1996), 116 Ohio App.3d 615, 626, citingBradley at 144 (holding that we are to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). We will only reverse on trial strategy grounds if defense counsel's trial strategy deviated from the standard of reasonableness. State v. Burgins (1988), 44 Ohio App.3d 158,160; State v. Newsome, Ashtabula App. No. 2003-A-0076,2005-Ohio-3775, at ¶ 8.
 {¶ 149} In claiming ineffective assistance, appellant first argues that his trial counsel incompetently advised appellant to waive his right to a jury trial to have his case tried before the judge. However, appellant signed a document that verified that he voluntarily waived his right to a jury trial in order to proceed with a bench trial. Likewise, appellant verbally acknowledged to the trial court that he signed the jury trial waiver. Such circumstances defeat appellant's ineffective assistance claim.State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666;State v. Fazio (Nov. 2, 1994), Belmont App. No. 93-B-10.
 {¶ 150} Next, appellant claims that his trial counsel was ineffective by not opposing the joining of the three indictments in a common trial. In raising this argument, appellant claims that, had only one case been tried, he would have a "good preview of [appellee's] evidence in the remaining cases." However, we find no prejudice from appellant's assertion because separate trials would also have given appellee an equal preview of appellant's evidence and theory of the case. We further find no ineffective assistance from appellant's assertion that, if the parties separately tried the indictments and if appellant had been found guilty at the first trial, he would have had the opportunity to engage in serious plea discussions to obtain a less severe sentence. Such an assertion is based on the speculative argument that appellee would entertain serious plea discussions after appellee prevailed on the first trial. Speculation about a different trial tactic does not show ineffective assistance of counsel. See State v. Combs (1994),100 Ohio App.3d 90, 104; State v. Hessler, Franklin App. No. 01AP1-011, 2002-Ohio-3321, at ¶ 49. In this regard, we also reject appellant's ineffective assistance claim based on the speculation that he could have received a less severe sentence had he tried the cases separately. See Combs at 98; Hessler
at ¶ 49.
 {¶ 151} Appellant further claims that his trial counsel was ineffective by providing only a brief opening statement. In support, appellant states that trial counsel "could have discussed at greater length why Bruce Gurwin and Heather Rodgers were the truly guilty parties." However, "the decision to give a short opening statement is a tactical decision." State v.Addison, Franklin App. No. 03AP-1102, 2004-Ohio-5154, at ¶ 13. Here, we have no cause to second-guess the strategy behind trial counsel's opening statement, given no indications from the record that a longer opening statement would have made any difference in the trial's outcome. Id. In concluding as such, we note that, while appellant criticizes trial counsel for not detailing during opening statements Gurwin's and Rodgers' alleged guilt, appellant's trial counsel did provide some arguments in that regard.
 {¶ 152} We also reject appellant's argument that his trial counsel was ineffective by providing minimal cross-examination on appellee's witnesses. "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." State v. Leonard, 104 Ohio St.3d 54, 2004-Ohio-6235, at ¶ 146. Here, we have no cause to second-guess appellant's trial counsel's cross-examination strategy, especially recognizing a strategic decision to get particular witnesses off the stand, e.g., Barnes, Pollard, and Chitwood, who were "sympathetic and credible[,]" and Reddington, who was a "dangerous witness[.]" In concluding as such, we reject appellant's argument that his trial counsel did not properly elaborate on cross-examination the complexities of subrogation. Rather, appellant's trial counsel did raise subrogation issues during cross-examination of certain witnesses. Appellant's argument also lacks merit because appellee also presented Attorney Goldstein to discuss subrogation issues on personal injury settlements.
 {¶ 153} Appellant additionally claims that his trial counsel was ineffective by failing to properly prepare for trial. Appellant contends that his trial counsel did not conduct an interview of certain witnesses as appellant had requested. However, we have no cause to second-guess appellant's trial counsel's decisions not to conduct the requested interviews, given that the record contains no information indicating that the requested interviews would have affected the outcome of the trial. See Strickland at 687. As an example, the record does not indicate what information the interviews would have presented.
 {¶ 154} In further claiming that his trial counsel failed to properly prepare for trial, appellant notes that his trial counsel failed to provide complete discovery. However, the record does not establish that trial counsel's failure to provide complete discovery prejudiced appellant, given that the trial court ultimately did not prevent appellant, representing himself, from introducing exhibits into evidence on the sole basis of discovery defects. Thus, we find no prejudice from the above assertion. See Strickland at 687.
 {¶ 155} Lastly, appellant claims that his trial counsel was ineffective by stipulating "copies of checks which resulted in the original documents not being available for handwriting expert Ray Fraley to review." In raising this assertion, appellant notes that Fraley indicated that he needed the original documents to render a more accurate and complete handwriting analysis against appellant's handwriting exemplar. We recognize that, in its decision determining appellant's guilt, the trial court discounted Fraley's handwriting analysis because Fraley made handwriting comparisons against photocopies of pertinent checks and bank records. However, we need not find that appellant's trial counsel rendered ineffective assistance through such circumstances because, when Fraley testified, appellant was representing himself. Thus, it was incumbent upon appellant to ensure that Fraley's testimony was effective, and, before or during Fraley's testimony, appellant made no request to obtain the original checks for the witness's review.
 {¶ 156} Therefore, based on the above, we conclude that appellant's trial counsel's performance did not rise to the level of ineffective assistance. As such, we overrule appellant's sixth assignment of error.
 {¶ 157} Lastly, in appellant's eighth assignment of error, appellant contends that the trial court erred by including in the restitution order the attorney fees upon which appellant and the victims agreed. We disagree.
 {¶ 158} R.C. 2929.18(A)(1) authorizes a trial court to order an offender to pay restitution to a victim in an amount based upon the victim's economic loss. Economic loss means:
* * * [A]ny economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any loss of income due to lost time at work because of any injury caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense. * * *
R.C. 2929.01(M).
 {¶ 159} As for attorney fees, courts have recognized that a lawyer is not entitled to a fee if the lawyer engages in fraudulent conduct against the client. See In re Fraelich,
Trumbull App. No. 2000-T-0016, 2004-Ohio-4538, at ¶ 23; King v.White (Kan. 1998), 265 Kan. 627, 642. "`A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter.'" Fraelich at ¶ 23, quoting Restatement of the Law 3d, Governing Lawyers (2000), Section 37. Similarly, "`[a] lawyer who does not at all times represent the client with undivided fidelity is not entitled to compensation for his or her services[.]" White at 642, quoting 7 Am.Jur.2d, Attorneys at Law Section 279, Fidelity and professional competence. "`An attorney who is guilty of actual fraud or bad faith toward a client * * * is not entitled to any compensation for his or her services.'" Id.
 {¶ 160} Although the above cases do not involve restitution orders under Ohio's restitution statutes, the principles in the cases apply here. By committing theft against his clients, appellant is not entitled to the fees from the contracts that culminated into the thefts, and, thus, any set-off of the fees from the restitution award would actually contribute to the economic loss to the victims in contravention of R.C.2929.18(A)(1) and 2929.01(M). Therefore, we conclude that the trial court did not err by including in the restitution order the attorney fees upon which appellant and the victim agreed. Thus, we overrule appellant's eighth assignment of error.
 {¶ 161} In summary, we overrule appellant's first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error. As such, we affirm the judgments of the Franklin County Court of Common Pleas.
Judgments affirmed.
Petree and Sadler, JJ., concur.