Marhttat.t., C. J.
 

 At the April, 1926, term of Lake county common pleas court George Vargo was convicted of first degree murder without recommendation of mercy. On error to the Court of Appeals the judgment was reversed by a majority of the court for alleged error in the charge, and the cause remanded for new trial. The cause has been submitted to this court to review the judgment of reversal by the Court of Appeals. While the assignment of error relates to the charge of' the court, the charge involves the application of legal principles to the evidence, and it has there
 
 *497
 
 fore been found necessary to carefully read the entire record.
 

 George Vargo was indicted on a charge of murder committed “unlawfully, purposely, and of deliberate and premeditated malice.” The offense was committed about 5 o’clock in the evening of March 31, 1926. Anna Sabo, the deceased, was his landlady and a woman of good character. She was a widow having several children, her husband having died about a year before, and the accused and another man were roomers in her home and had been roomers for several years prior to the death of her husband. It was the theory of the state that Vargo wanted to marry her and that she had rejected his proposals of marriage; that Vargo was jealous of the other roomer. In support of this theory, the state offered testimony of statements of the accused some time prior to the homicide that he did not like his rooming place, and that he would probably get in jail because the woman did not treat him right. There was further testimony that he had been watching the deceased and the other roomer; that she was doing some cooking for the other roomer; and that she did not do any cooking for him. A fellow workman testified that on the morning of the day of the homicide he had had a conversation with the accused relative to a possibility of being out of work, and the accused said:
 

 “I’m going to kill some one to-day, and then they will give me bread.”
 

 Neither the accused nor the other roomer worked during the afternoon of that day. Vargo had lunch in his room and then left the house and did
 
 *498
 
 not return until about 4 o’clock. At that time he requested Mrs. Sabo to cook some meat and cabbage for him, which she apparently refused to do, and thereupon a violent quarrel took place, in the course of which the accused called Mrs. Sabo vile names. This conversation was overheard by the other roomer, named Flitar, who testified that thereupon Yargo went upstairs to his room where he heard him moving about as though searching for something. Shortly thereafter he again went downstairs, where he renewed the quarrel and again called Mrs. Sabo vile names. After a short time he again went upstairs to his room, at which time Flitar came down from his room and left the house and heard no further controversy between them. John Sabo, one of the children, aged 14, returned from school after Flitar had left the house. There was no quarrel between Yargo and his mother after he returned. He passed Yargo on the street near the home, and later saw him sitting on the porch. John Sabo proceeded to do his chores, apparently taking some considerable time in doing them, and on entering the house saw Yargo draw his gun and point it at his mother, and then the boy ran for the marshal, at his mother’s request. Immediately after leaving the house, he heard four shots fired, but did not return. Elizabeth Sabo, aged 12, arrived home before her brother and heard some of the quarreling, and saw Yargo draw his gun, point it toward Mrs. Sabo, and again put it back in his pocket. She was present later when he fired the shot and heard him say, “I’ll fix you.” She saw her mother fall, and then ran away, and heard a second shot when she was on the porch. She
 
 *499
 
 had seen Vargo go upstairs twice, thereby corroborating Flitar. The testimony of the witnesses fairly established that the homicide occurred about 4:45 o’clock.
 

 The foregoing summary of these and other witnesses is important as indicating the length of time between the first quarrel, about cooking, and the time of the homicide. It is apparent that at least 45 minutes must have elapsed, during which he made two trips upstairs, on the first visit procuring his revolver from a trunk and filling it with cartridges, and after his second trip upstairs going to a nearby home of a relative, sitting for a time on the porch of the Sabo home, and sitting for another short period inside the house in the downstairs portion. The record shows that when Vargo pointed the gun at Mrs. Sabo and said, “I’ll fix you,” she sought to escape and he shot her in the back, causing her to fall, and then took a step or two forward and fired three other shots into her prostrate body. One of these shots fractured the spine, another plowed through one of the lungs, fracturing a rib, proceeded through the thyroid and other organs, and this was probably the shot which caused her death. Vargo thereupon again went upstairs, where he remained, and where he was found by the officers engaged in the act of extracting the empty shells from his revolver Upon being taken to the jail by the deputies, he was later and within a short time thereafter visited by the sheriff, who questioned him and drew from him his story of the homicide. Vargo and the sheriff had been acquainted for many years. Vargo apparently talked without reserve. His first explanation was:
 

 
 *500
 
 “Too much trouble; I shoot the Missus.”
 

 He further stated to the sheriff that everything was all right between him and Mrs. Sabo until Flitar came, and that she cooked for Flitar, but would not cook for him. He said he was “mad” when he shot her. He did not say that he was intoxicated, but when asked if he had been drinking, he said, “Not too much.” He related the story of the quarrel and the shooting in considerable detail to the sheriff, which was, in substance, as follows: That he had returned to the home about 3 o’clock and wanted Mrs. Sabo to cook some cabbage, which she refused to do, and that he then went to the home of his relative to have the cabbage cooked, and came back and told Mrs. Sabo, and that she then told her son, John, to go and get a policeman. He pretended not to know the reason for her sending for a policeman, but that it made him “mad.” He then said to the sheriff:
 

 “I go upstairs and get my gun to fix the Missus.” He further stated that when he shot Mrs. Sabo she was looking out at the door, and that after shooting her she fell down and then he shot two or three times more. He admitted that he had previously shown the gun to Mrs. Sabo.
 

 It was the theory of the state that Vargo killed Mrs. Sabo because of jealousy and her refusal to marry him, and it was the theory of counsel for the defense that he killed her in the heat of passion, because of her refusal to cook the food for him, and because she had threatened to send for a policeman to have him arrested, and, further, that he was so intoxicated that he did not know what he was doing. The witnesses for the state
 
 *501
 
 testified that lie liad been drinking, but that he was not much intoxicated. Vargo and his relatives testified that he was pretty drunk, Vargo himself insisting that he did not know what he was doing. Vargo was a witness in his own behalf and frankly admitted the homicide, and in the course of his direct examination, while being interrogated by his own counsel, the record shows the following:
 

 “Q. At any time before you got the gun out or loaded it or took it downstairs, did you have any intention of shooting Mrs. Sabo or injuring her? A. I didn’t have in my mind then; I just was angry and went up and loaded it.
 

 “Q. Did you then or any other time think or reflect about killing Mrs. Sabo? A. It never was in my mind.
 

 “Q. Did you then or at any time turn the matter over in your mind and come to a conclusion that you would kill her? A.
 
 Only that time;
 
 other times I never had it in my mind.
 

 “Q. By Mr. Blakely: Only at that time! A.
 
 Only at that time.”
 

 Again, on cross-examination by counsel for the state, the record shows the following:
 

 “Q. Did you tell Mr. Nolan that it was at the time that you went upstairs was the only time that you had it in your mind to kill Mrs. Sabo, right here in court? A. Yes.”
 

 There was at this time a controversy between counsel over Vargo’s statement of having entertained a purpose to kill, which indicated that counsel for the defendant was surprised at the defendant’s answer. The answer is highly significant in that it shows a purpose to kill, which was
 
 *502
 
 entertained approximately 45 minutes before the actual homicide, and that in the interim he had made two trips upstairs, a trip to a nearby home, had spent some time sitting on the porch of the Sabo home, and other time sitting in the house. It is significant as indicating that the homicide was not committed in sudden anger or in the heat of passion.
 

 This was the state of the record when the court charged the jury. The court clearly and correctly charged that the burden was upon the state to prove the guilt of the accused and to prove each essential element of the crime beyond a reasonable doubt; that the indictment created no presumption of guilt; that every person is presumed to be innocent of the commission of any crime or offense against the law; and that this presumption remains with the person so accused of crime and operates as a shield and protection during the whole course of the trial until the evidence is such as to satisfy the jury beyond a reasonable doubt that he has been proved guilty. The burden of proof and necessity of making proof of every essential element beyond a reasonable doubt was stated several times, and perhaps with unnecessary detail and repetition.
 

 After the argument and before the charge was given, counsel for the defendant made a number of requests, among which was the following:
 

 “If you find from the evidence in this case by reason of anger or intoxication, or both, that the mind of the accused was in such condition that he was incapable of reflection or deliberation, then he cannot be found guilty of murder in the first degree. ’ ’
 

 
 *503
 
 It must be borne in mind that the accused entered a plea of not guilty, and that the state had proceeded upon the theory that the motive of the homicide was jealousy and malice. The state rested after having proved the homicide, with all its horrible details, and had attempted to show that there was not a violent degree of anger on the part of the accused, and that he was only slightly intoxicated, if at all. The defendant then introduced evidence of a drunken condition and claimed that he did not know what he was doing at the time, and further sought to excuse the homicide on the ground of violent provocation, and sudden and uncontrollable impulse.
 

 It is obvious from the nature of the defense made, and from the fact of having made the above-stated request, that anger and intoxication were relied upon as affirmative defenses. The trial court, having that request to deal with, after having correctly charged upon the subject of murder and the lesser degrees of that crime, proceeded to charge upon the subject of anger and intoxication as affirmative defenses, and in so doing charged the following:
 

 “As we have said to you, if you find from the evidence in the case, established by a preponderance of the evidence by the defendant, that by reason of anger or intoxication, or both, that the mind of the accused was in such condition that he was incapable of reflection, or deliberation, or premeditation, then he cannot be found guilty of murder in the first degree.
 

 “And if you should find from the evidence, and a preponderance of the evidence, that by reason
 
 *504
 
 of his intoxication and anger he was in snch condition as to be incapable of forming any intention or design-to take the life of the deceased, then he could not be found guilty of murder in the second degree, but would be guilty of manslaughter only.”
 

 The language of the request of counsel for defendant is such as to indicate that he was only seeking an instruction which would permit his client to escape a verdict of murder in the first degree. The state had offered no evidence of anger, except such as would necessarily accompany jealousy and such as would naturally be in the mind of a rejected lover. No witness for the state testified to more than a mild degree of intoxication. The state had nothing to gain by any testimony on the subject of intoxication, but it was, of course, interested in proving anger, because anger is an evidence of malice. The defendant had nothing to gain by offering evidence of either anger or intoxication, or both, unless either or both were of such violent character as to affect his intelligence and his knowledge of right and wrong so that he was not capable of forming a purpose to kill, in which event it would have been a defense to either first or second degree murder, or if it was of such violent character as to render him incapable of deliberation or premeditation, in which event he could not have been found guilty of murder in the first degree. Without repetition, it may be stated that anger is in the same category as intoxication in this respect. While anger is a proper element to be proved by the state in establishing malice, inordinate anger of that degree which would render the accused incapable of reflecting or deliberat
 
 *505
 
 ing is not necessary to be shown by the state, but, on the contrary, must be regarded as defensive. Not all evidence offered by a defendant in a homicide case is to be regarded as an affirmative defense. It may be introduced only for the purpose of rebutting matters essential to be proved by the state. It is conceivable that circumstances might be such as would make it incumbent upon the state to show intoxication as a part of the proof in a homicide case, but the instant case is certainly not of that character. The state was not interested in showing intoxication, and any evidence on that subject introduced by the defendant must necessarily be an affirmative defense. The state having introduced no direct evidence of anger, except the same might be an element of jealousy, and the defense having undertaken to show that there was a violent quarrel and anger of such intensity as to cause the defendant to suddenly form the purpose to kill, the question arises whether the court was justified in treating this as an affirmative defense.
 

 This court more than 50 years ago declared a rule by which to determine what is necessary to be established by the state beyond a reasonable doubt, and what is necessary to be established by the defendant as an affirmative defense by a preponderance of the evidence. In
 
 Davis
 
 v.
 
 State,
 
 25 Ohio St., 369, the following proposition is declared in the third syllabus:
 

 “Where the fact of killing is proved, malice is to be presumed, and all the circumstances of justification, excuse, or extenuation must be made out by the accused, unless they appear from the evidence adduced against him.”
 

 
 *506
 
 In support of that syllabus, Welch, J., at page 373 of the opinion, stated:
 

 “The charge of the court, that malice is to be intended from the fact of killing, and that circumstances of justification or extenuation, not disclosed by the evidence adduced against him, are to be made out by the accused, is in our opinion unexceptionable, and the well-settled law of such cases.”
 

 In the instant case, matters of violent anger and intoxication were shown by the defense, if shown at all, under circumstances where the state was not required to prove them, and were clearly offered for the purposes of justification, excuse, and extenuation.' The defendant called only two witnesses other than himself, and the defensive testimony was confined largely to anger and intoxication. The defendant testified in his own behalf and admitted the homicide and the purpose to kill. It is apparent, therefore, that the sole theory of the defendant was that anger and intoxication were of such degree of intensity as to justify a verdict of one of the lesser degrees of homicide.
 

 The defendant evidently expected the jury to believe that the homicide occurred within 5 minutes •after the formation of the purpose to kill, but the jury evidently believed and the record certainly clearly proves that it must have been at least 45 minutes after the time when he admits that he formed a purpose to kill until the actual homicide took place. The defendant was represented by able counsel, and this record admits of no other rational theory on the part of counsel than that anger and intoxication were shown as affirmative defenses.
 

 
 *507
 
 It is apparently the theory of counsel for the defendant that affirmative defenses impose upon the defendant the burden of establishing them by a preponderance of the evidence only when they are claimed as a complete defense, and not when the testimony is offered for the purpose of reducing the degree of crime. We find no authority for this view. The presumption of innocence prevails throughout every trial for crime, and this presumption prevails not only upon the general issue raised by the indictment and the plea upon the specific crime charged, but also upon every lesser degree of that specific crime and to every lesser offense included therein.
 

 It follows that all defenses known as affirmative defenses, and upon which evidence is introduced to excuse, justify, or extenuate the major or included offenses, to be available to the defendant, must also be proved by a preponderance of the evidence. And this burden must be sustained by the defendant whether the testimony so introduced by him tends to excuse or justify the alleged crime altogether or whether it is only defensive to those elements which establish the greater degrees of the crime charged.
 

 The court’s charge does not come within the well-established rule that where the court has given two instructions as to the
 
 quantum
 
 of evidence or burden of proof, one correct and the other erroneous, a reviewing court will not presume that the jury followed the correct rule to the exclusion of the incorrect rule. We find no error in the charge of the court. The court gave one correct rule as to the burden and
 
 quantum
 
 of proof to be established
 
 *508
 
 by the state and then interpreting the request of counsel as one for an instruction upon the subject of affirmative defenses gave the instruction now complained of. In the absence of any request, the court might well have omitted any instruction on the subject of affirmative defenses. A request having been made, the court was not bound to give it
 
 verbatim,
 
 neither was the court bound to ignore it because it was not, strictly speaking, an accurate statement of the law involved. The court might properly treat it as a suggestion for a proper charge on the theory which the counsel for the defendant entertained.
 

 The only other feature necessary to be noticed was that portion of the charge complained of and hereinbefore quoted, which contained the following language, “established by a preponderance of the evidence by the defendant.” An accurate instruction would, of course, have left the preponderance to be determined by all the evidence, but the jury could not have been misled by this, because they were only required to find that the defendant’s evidence preponderated in his favor. The instruction was therefore more favorable to the defendant. We find no error in the charge. The judgment of the Court of Appeals must therefore be reversed, and the judgment of the court of common pleas affirmed.
 

 Judgment reversed.
 

 Day, Allen, Kinkade and Jones, JJ., concur.