OPINION
{¶ 1} In the instant appeal, submitted on the record and briefs of the parties, appellant, Brian LeMasters, appeals his conviction in the Lake County Court of Common Pleas on one count of Grand Theft of a Motor Vehicle, a felony of the fourth *Page 2 
degree, in violation of R.C. 2913.02(A)(1). For the reasons that follow, we affirm the judgment of the lower court.
 {¶ 2} The charges in question arose from an incident which occurred on February 26, 2006. At approximately 2:30 a.m., Dennis Williams was watching television at his home, located at 6820 Warner Road (State Route 320), in Madison Township, Ohio, when he was disturbed by a loud crash. He rushed to the living room window, looked out, and saw a vehicle with extensive damage sitting on the road in front of his house. Williams immediately called 911 to summon assistance. After hanging up the phone, he went outside to assess the accident scene. The vehicle, a blue 2004 Suzuki Verona, was extensively damaged, and appeared to have rolled over. The vehicle also appeared to have struck Williams' company vehicle, which was parked in his driveway. Williams approached the vehicle, where he found LeMasters sitting behind the wheel, and informed him that help was on the way. LeMasters, who appeared agitated, told Williams that he did not need help, and unsuccessfully attempted to leave the scene.
 {¶ 3} Shortly thereafter, the Madison Fire Department rescue squad appeared and attempted to treat LeMasters for his injuries. Paramedic Kendall Wilson, who treated LeMasters, stated that he was "not cooperative at all," that he repeatedly stated "I know I am in trouble. I have been drinking," and that he violently resisted treatment, insisting that members of the rescue squad not touch him until his eyeglasses were found, and attempting to break free from the restraints holding him to the backboard. The squad eventually was able to transport LeMasters to Geneva Hospital for treatment. *Page 3 
 {¶ 4} Officer Jason Clark, of the Madison Township Police Department, arrived a few minutes later. While investigating the accident, he heard a stolen vehicle report from the Madison Village Police Department over his radio. The vehicle's description matched that of the Suzuki, which had been reported stolen from the parking lot of Quigley's Saloon, a restaurant and bar, located on North Lake Street in Madison Village. Quigley's is located approximately three miles away from the scene of the accident. Officer Clark ran the vehicle's license number through the LEADS system, found that it matched that of the vehicle that had been reported stolen. He then relayed this information to the Madison Village Police Department. Officer Tim Gleba of the Madison Village Police Department, who had taken the stolen vehicle report from Janine Hathaway, the owner, arrived at the accident scene followed by Hathaway and two of her friends. The women, who had been attending a birthday party, identified LeMasters as having also been at Quigley's that evening.
 {¶ 5} On December 22, 2006, the Lake County Grand Jury returned a one count indictment, charging LeMasters with Grand Theft of a Motor Vehicle, a felony of the fourth degree, in violation of R.C. 2913.02(A)(1). LeMasters waived his right to be present at the arraignment, and a plea of "not guilty" was entered on his behalf.
 {¶ 6} On Feburary 22, 2007, after being granted leave by the court, LeMasters filed a motion to suppress. This motion was ultimately withdrawn by his counsel. LeMasters also filed a motion for a competency evaluation, and, pursuant to this motion, was referred to the Lake County Adult Probation Department. After LeMasters was found competent by the court, the matter proceeded to trial. *Page 4 
 {¶ 7} On July 11, 2007, following a two day trial, the jury found LeMasters guilty as charged. He was sentenced on July 20, 2007, to a fifteen month term of incarceration.
 {¶ 8} LeMasters timely appealed, assigning the following as error for our review:
 {¶ 9} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 10} On appeal, LeMasters argues that "[t]he evidence is insufficient as a matter of law to sustain [his] conviction * * * where the conviction is not supported by competent, credible evidence which proves guilt beyond a reasonable doubt."
 {¶ 11} We note, at the outset, that although LeMasters' assignment of error challenges his conviction solely on the basis of being against the manifest weight of the evidence, his argument also appears to raise a sufficiency of the evidence challenge, and unwittingly conflates the legal standards between the two. We shall, therefore, discuss both standards briefly before addressing his argument.
 {¶ 12} The analyses for considering the weight and sufficiency of the evidence are related, but distinct. The Ohio Rules of Criminal Procedure provide that a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim. R. 29(A). "`[Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-52, quoting Black's Law Dictionary (6 Ed. 1990), 1433. Essentially, "sufficiency is a test of adequacy," that *Page 5 
challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id.
 {¶ 13} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 319. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 14} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 387 (emphasis sic) (citation omitted). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id.
 {¶ 15} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at the syllabus. When reviewing a manifest weight challenge, however, the *Page 6 
appellate court sits as the "thirteenth juror." Thompkins,78 Ohio St.3d at 387 (citation omitted). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 16} In order for a jury to find LeMasters guilty on a charge of Grand Theft of a Motor Vehicle, in violation of R.C. 2913.02(A)(1), the state must prove, beyond a reasonable doubt, that he, "with purpose to deprive the owner of [the motor vehicle] * ** knowingly obtain[ed] or exert[ed] control over * * * [it] * * * [w]ithout the consent of the owner or person authorized to give consent."
 {¶ 17} At trial, LeMasters' counsel elected not to raise a Crim. R. 29 motion for acquittal challenging the sufficiency of the evidence submitted by the state. Accordingly, this issue is waived for the purposes of appeal. State v. McCrory, 11th Dist. No. 2006-P-0017,2006-Ohio-6348, at ¶ 39, citing State v. Beesler, 11th Dist. No. 2002-A-0001, 2003-Ohio-2815, at ¶ 21.
 {¶ 18} LeMaster's challenges his conviction on the manifest weight of the evidence grounds based upon the Eighth District's decision inState v. Mattison (1985), 23 Ohio App.3d 10, which listed the "following factors as guidelines to be taken into account by a reviewing court:
 {¶ 19} "1. The reviewing court is not required to accept as true the incredible; *Page 7 
 {¶ 20} "2. whether the evidence is uncontradicted;
 {¶ 21} "3. whether a witness was impeached;
 {¶ 22} "4. what was not proved;
 {¶ 23} "5. the certainty of the evidence;
 {¶ 24} "6. the reliability of the evidence;
 {¶ 25} "7. whether a witness' testimony is self-serving;
 {¶ 26} "8. whether the evidence is vague, uncertain, conflicting or fragmentary."
 {¶ 27} Id. at syllabus (emphasis sic).
 {¶ 28} In so doing, LeMasters alleges several "inconsistencies," which "taken as a whole * * * multiply and present a confusing mesh of what exactly happened on the night in question," and render the jury's verdict suspect. We disagree.
 {¶ 29} As an initial matter, "[t]his court has repeatedly held that while `the Mattison factors are helpful guides when exploring whether a verdict is against the weight of the evidence * * * they do not create a specific standard [of review] to be applied to manifest weight claims.'"State v. Higgins, 11th Dist. No. 2005-L-215, 2006-Ohio-5372, at ¶ 38, quoting State v. Torres-Flores, 11th Dist. No. 2005-L-046,2006-Ohio-3212, at ¶ 29. Instead, we have "repeatedly deferred to the standards of review set forth by the Supreme Court of Ohio." Id., quoting State v. Peck, 11th Dist. No. 2004-L-021, 2005-Ohio-1413, at ¶ 13.
 {¶ 30} Applying the aforementioned standard of review, we find no merit to appellant's arguments.
 {¶ 31} At trial, the state introduced testimony from six witnesses: Williams, Paramedic Wilson, Officers Clark and Gleba, Dawn Shannon, and Hathaway. *Page 8 
 {¶ 32} Williams testified that he initially approached the wrecked vehicle immediately after reporting the accident. He stated that he spent approximately three minutes on the phone with the 911 dispatcher, and was looking out of a large picture window in his living room at the accident while on the phone. Williams testified that he was able to view LeMasters sitting behind the steering wheel at a distance of approximately one or two feet, and observed no other individuals around the scene of the accident prior to the arrival of rescue and police personnel. Williams also stated that when he went to check on LeMasters, the first thing he said was that he could not find his glasses and needed his glasses. When Williams told him to relax, because help was on its way, LeMasters responded that he did not help, but "need[ed] to get out of here," after which he turned the ignition key. The car started, "ran full throttle for like seven or eight seconds, [and] then [stopped running] with a loud bang." Williams testified that after failing to get the car running, LeMasters attempted to open the door to get out, but Williams was able to keep him calm until assistance arrived a few minutes later.
 {¶ 33} Paramedic Wilson also testified, stating that the rescue squad arrived at the scene of the accident at 2:39 a.m., approximately seven minutes after being dispatched. Wilson stated that when he approached, he observed a heavily damaged vehicle, with LeMasters behind the wheel. He described LeMasters as "very combative, looking for his glasses," and was "not going to let us take care of him until he found his glasses." Paramedic Wilson stated that he also observed no one else in or around the vehicle, except for Williams. Paramedic Wilson testified that when he first walked over to the vehicle, the driver's door was open. Wilson asked LeMasters if he was okay. *Page 9 
LeMasters responded, "I know I am in trouble. I have been drinking," and repeated this statement several times. Paramedic Wilson said that he had a hard time getting LeMasters to cooperate, with his insistence that he find his glasses, to the point that he could not keep him in the car. Eventually, he was able to convince LeMasters to allow them to put a cervical collar on him and place him on a backboard, although later, he had to be restrained and handcuffed to the backboard for his safety and the safety of the squad after physically breaking the soft restraints typically used for possible spinal injury victims.
 {¶ 34} Officer Clark testified that he arrived on the scene at 2:41 a.m., and observed "the firefighters attempting to help the (unidentified) male. The male was arguing with them stating that he needed to find his glasses." Officer Clark "told him to calm down, relax, the fire department is just trying to help." Officer Clark testified that when LeMasters saw him, he said, "Oh great, the Madison fucking cops. Now I'm in trouble." Officer Clark further stated that LeMasters kept insisting he would not allow anyone to help him, or provide any information regarding his identity "until he found his glasses." Due to LeMasters' refusal to cooperate in any meaningful way, Officer Clark was unable to confirm his identity that night.
 {¶ 35} Officer Clark testified that he became aware that a vehicle meeting the description of the one involved in the accident had been stolen "shortly after arrival," after which, he verified that the Suzuki was, in fact, the stolen vehicle, and he, along with another officer from his department, arranged to have the vehicle towed. Clark stated that he later found LeMasters' glasses "in a ditch, 2 houses back" from where the vehicle came to a rest. *Page 10 
 {¶ 36} Officer Gleba testified that he was dispatched to Quigley's at approximately 2:35 a.m., that same morning. He met with Hathaway, the owner of the vehicle and her friend, Shannon, to make a report. Officer Gleba knew both women, since Shannon worked for the Madison Village Police Department as a dispatcher/officer, and Hathaway, who was a medical secretary, was also an auxiliary officer for the department. Gleba stated that Hathaway told him she had last seen her vehicle at 8:00 p.m., the prior evening, when she arrived at Quigley's for Shannon's daughter's twenty-first birthday party, and had come out at approximately 2:30 p.m., to find the vehicle missing. Gleba said that Hathaway had locked her purse inside the vehicle that night, and that she always kept an extra set of keys in her purse. Officer Gleba stated that he "then scanned the parking lot for forced entry or glass, [but] none was found."
 {¶ 37} After submitting his report to dispatch, he heard a report on the radio that a squad was "rolling up to a possible injury accident" on a similar vehicle. He submitted the license number of Hathaway's car to dispatch, and confirmed that it was Hathaway's car that had been involved in the accident. Gleba then left the statement form with Hathaway and proceeded to the scene of the accident. Hathaway, Shannon, and Gleba's wife, a friend who had also attended the party, followed in Mrs. Gleba's vehicle.
 {¶ 38} Officer Gleba further testified that, on arrival at the accident scene, he entered the ambulance and found "the suspect lying on the cot thrashing his arms," and "screaming and yelling." He stated that LeMasters was "very angry," in a "lot of pain," and repeatedly saying that he "wanted his glasses." He testified that Hathaway and a friend "as well as another Madison Village Officer who is very well known in the *Page 11 
community [Shannon], came up to the scene * * *. She then came to the [ambulance] to possibly see who it was and said it was Brian LeMasters."
 {¶ 39} Both Shannon and Hathaway corroborated this portion of Officer Gleba's testimony, with Shannon testifying that she was the person who identified LeMasters in the ambulance. Both women testified that they had seen him in Quigley's that evening. Evidence was submitted that Hathaway was the owner of the vehicle, and she testified that she had not given consent for anyone to use her vehicle.
 {¶ 40} LeMasters testified on his own behalf at trial. He did not dispute that he was in Quigley's that night. LeMasters testified that he arrived home from work, took a shower, ate, and walked to Quigley's, arriving at approximately 11:30 p.m., on February 25. He stated that he "walked in, * * * kind of looked around, seen a few people that I knew and noticed there was three Madison Village Police Officers in the bar and I sat down * * * and had me a beer." He stated that, during the course of the evening, he "shot a game of pool, sang karaoke, [and] talked to a few people." During the course of the evening, LeMasters claimed to have had "a couple of draft beers and * * * a couple shots of tequila." He testified that he went outside of Quigley's two or three times that evening to have a cigarette. He also does not dispute that he was found behind the wheel of Hathaway's car, given that he spent several months in the hospital as a result of the accident.
 {¶ 41} Although he denies none of the aforementioned facts, the crux of LeMasters' testimony and defense is based upon his alleged lack of memory of the events of that night after he left Quigley's. LeMasters testified about an earlier "major incident" involving a confrontation he had with Madison Village Police Officers when *Page 12 
they arrived at "a relative's home" to effectuate an arrest of his relative. Ever since then, he alleges that Madison Village Police have engaged in a pattern of persecution against him, culminating in what he suspects was a successful attempt by someone connected with the police department to place a drug into his drink. He further testified that "somebody" who had actually taken Hathaway's vehicle "must have offered him a ride," and left him in the car following the accident. In the alternative, he testified that, in his alleged state of involuntary intoxication, he may have taken the car, but "did not know he stole it or was driving it," and therefore he did not possess the required intent to be convicted of Grand Theft.
 {¶ 42} Generally, the issue of intoxication arises in cases where intent is an element of the crime. Theft is a specific intent crime. See e.g., State v. Feltner, 2nd Dist. No. 06-CA-20, 2007-Ohio-866, at ¶ 10;State v. Crisp, 10th Dist. No. 06AP-146, 2006-Ohio-5041, at ¶ 10. However, intoxication is an affirmative defense, "which thedefendant must prove by a preponderance of the evidence." State v.Robinson (1976), 47 Ohio St.2d 103, 108, citing State v. Vargo (1927),116 Ohio St. 495, at paragraph one of syllabus (emphasis added). LeMasters clearly has failed to meet this burden.
 {¶ 43} In the instant case, LeMasters further asserts that certain aspects of Williams' testimony should have been deemed unreliable, and/or unclear because he first surveyed the accident from 45 feet away from his home, through a window, and there was inadequate lighting. He also avers that Williams' testimony should have further been called into question because he did not recall airbags being deployed when the photos of the vehicle "clearly illustrated deployed airbags." He also calls into *Page 13 
question Williams' testimony that "he had no trouble starting the severely damaged automobile."
 {¶ 44} When assessing the credibility of witnesses, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. This is because it is "the trier of fact who is in the best position to observe and evaluate the demeanor, voice inflection, and gestures of the witnesses." State v. Dach, 11th Dist. Nos. 2005-T-0048 and 2005-T-0054, 2006-Ohio-3428, at ¶ 42 (citation omitted). Furthermore, "the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v.Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8. If the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id.
 {¶ 45} We fail to see how Williams' failure to recollect whether airbags were deployed is significant, given the fact that he was attempting to recall an event which occurred approximately 17 months earlier. Moreover, we do not find it incredible that a damaged vehicle may be able to be started, albeit briefly, following a rollover accident.
 {¶ 46} We find it much less credible that LeMasters could have moved, or been moved, into the driver's seat following the accident, considering the fact that the car had been so severely damaged, and the fact that Paramedic Wilson, the other indisputably unbiased witness, testified that LeMasters suffered a severely injured leg following the accident. This, along with LeMasters' own testimony that he suffered two crushed thoracic vertebrae, and two fractured lumbar vertebrae, and spent from "February 26th, *Page 14 
to the end of July" in the hospital for these injuries, make it extremely unlikely that events occurred the way he theorizes.
 {¶ 47} LeMasters also brings into question the fact that "examination of the parking lot where the alleged theft took place" revealed no signs of forced entry, which he finds "perplexing" given the fact that the stolen automobile was locked at the time of the incident. We are considerably less perplexed by these questions, given the undisputed evidence presented to the jury at trial.
 {¶ 48} It is well-settled that "[d]irect evidence, circumstantial evidence, or both may establish an element of the charged offense."State v. Griffin, 1st Dist. No. C-020084, 2003-Ohio-3196, at ¶ 44, citing State v. Durr (1991), 58 Ohio St.3d 86, 92. Circumstantial evidence has been characterized as the "proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."State v. Silverman, 10th Dist. Nos. 05AP-837, 05AP-838 and 05AP-839,2006-Ohio-3826, at ¶ 102 (citation omitted).
 {¶ 49} Although Officer Gleba testified that he examined the parking lot for signs of forced entry, e.g. broken glass, he was unable to find any. However, on cross-examination when asked if he found "any evidence that the car was broken into," Officer Gleba responded that he did not, saying "[i]t was dark and it is a dirt driveway."
 {¶ 50} We do not find Officer Gleba's testimony inherently incredible. Breaking a window is not the only means of gaining entry to a locked car. Furthermore, the fact that the vehicle was so severely damaged significantly reduces the likelihood of seeing signs of forced entry on the vehicle itself. *Page 15 
 {¶ 51} Given the veritable mountain of undisputed direct and circumstantial evidence introduced at trial, which placed LeMasters at the scene of the theft and behind the wheel of the stolen vehicle within a few minutes and a few miles of its having been reported stolen, the fact that the state "failed to produce evidence showing that Mr. LeMasters was actually driving the car," does nothing to create, let alone add to any "quagmire," especially when such proof is not an element of the offense.
 {¶ 52} Based upon the foregoing, we cannot conclude the jury clearly lost its way or created a manifest miscarriage of justice by convicting LeMasters for Grand Theft.
 {¶ 53} LeMasters' sole assigned error is without merit.
 {¶ 54} The judgment of the Lake County Court of Common Pleas is affirmed. Costs to be taxed against appellant.
 COLLEEN MARY OTOOLE, J., MARY JANE TRAPP, J., concur. *Page 1